# United States Court of Appeals

*for the*

# Federal Circuit

CORNING INCORPORATED,

*Appellant,*

– v. –

DSM IP ASSETS B.V.,

*Appellee.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE
PATENT TRIAL AND APPEAL BOARD NO. IPR2013-00043

## BRIEF FOR APPELLANT CORNING INCORPORATED

MICHAEL L. GOLDMAN
RICHARD A. MCGUIRK
LECLAIRRYAN,
   A PROFESSIONAL CORPORATION
70 Linden Oaks, Suite 210
Rochester, New York 14625
(585) 270-2100

*Attorneys for Appellant
   Corning Incorporated*

February 3, 2015

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for Appellant Corning Incorporated certifies the following:

1.      The full name of every party represented by the undersigned counsel in this case is:  Corning Incorporated.

2.      The name of the real party in interest represented by the undersigned counsel in this case is:  Corning Incorporated.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by the undersigned counsel are: None.

4.      The names of all law firms and the partners or associates that have appeared for the party represented by the undersigned counsel in the trial court or agency or are expected to appear in this Court are:

LECLAIRRYAN,
A PROFESSIONAL CORPORATION
Michael L. Goldman
Edwin V. Merkel
Richard A. McGuirk
70 Linden Oaks, Suite 210
Rochester, New York  14625
Tel: (585) 270-2100
Fax: (585) 270-2179

LECLAIRRYAN,
A PROFESSIONAL CORPORATION
Jeffrey N. Townes
2318 Mill Road, Suite 1100
Alexandria, Virginia 22314
Tel: (703) 647-5914
Fax: (703) 647-5974

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...........................................................................i

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES ........................................................................... v

TABLE OF ABBREVIATIONS ..................................................................... vii

STATEMENT OF RELATED CASES ............................................................ix

STATEMENT REQUESTING ORAL ARGUMENT ..........................................xi

STATEMENT OF JURISDICTION.................................................................1

STATEMENT OF THE ISSUES....................................................................2

STATEMENT OF THE CASE.......................................................................3

    A.     Introduction ..................................................................3

    B.     Procedural History...........................................................7

    C.     Statement of the Facts ......................................................8

        1.     The '103 Patent .........................................................8

        2.     The Cure Dose Limitation ........................................10

        3.     Method for Determining the Cure Dose Limitation .................10

        4.     $R^2$ Values................................................................12

        5.     IPR Proceedings......................................................13

            a.     Corning's Petition.............................................13

b.     DSM's PO Response ......................................................14

c.     Corning's Reply.............................................................17

(i)     $R^2$ Values .......................................................19

(ii)     DSM's Cure Dose Tests......................................22

d.     The PTAB Issues Its Final Decision .............................23

e.     Corning's Request for Rehearing and the PTAB's
Decision on Rehearing....................................................24

SUMMARY OF THE ARGUMENT ....................................................27

ARGUMENT .......................................................................................30

I.     STANDARD OF REVIEW ...........................................................30

II.     TO THE EXTENT THE PTAB DID CONSTRUE THE CURE DOSE
LIMITATION, THAT CONSTRUCTION WAS UNDULY NARROW
AND IMPROPERLY IMPORTED LIMITATIONS NOT FOUND IN
THE '103 PATENT ....................................................................31

A.     The PTAB Is Required to Construe the Claims of the Patent and
Apply the BRI to the Claims ...........................................32

1.     The PTAB Improperly Failed to Explicitly Construe the
"Dispositive" Cure Dose Limitation........................32

2.     The PTAB Is Required to Apply the BRI to Claim Terms ......34

B.     The PTAB Improperly Narrowed the Cure Dose Limitation by
Importing a Requirement that the Data Achieve an Undisclosed $R^2$
Value...............................................................................35

C.     Conclusion.......................................................................40

III.    THE PTAB'S DETERMINATION THAT EXAMPLES 10-1 AND 10-2
        DO NOT TEACH THE CURE DOSE LIMITATION IS CONTRIVED
        AND BASED ON FLAWED ANALYSES ................................................40

        A.    Corning's Testing of Examples 10-1 and 10-2 Followed the '103
              Patent for Determining Cure Dose and Demonstrated that Examples
              10-1 and 10-2 Meet the Cure Dose Limitation ...................................41

        B.    Corning's Data Alone, Without any Curve Fitting, Shows that Prior
              Art Example 10-2 Meets the Cure Dose Limitation ...........................43

        C.    The PTAB Improperly Credited Dr. Bowman's Erroneous and
              Irrelevant $R^2$ Assessment of Corning's Cure Dose Statistics By
              Making Its Own Determinations of What Is Scientifically Valid.......46

              1.    Dr. Bowman's Opinions on $R^2$ Are Not Based on the '103
                    Patent or any Facts, and Thus Are Mere Conjecture ................47

                    a.    Dr. Bowman Argues that Corning's $R^2$ Values Are Too
                          Low and, Therefore, Flawed, But Fails to Explain Why
                          or How This Effects the Cure Dose Limitation..............47

                    b.    Dr. Bowman's Criticisms of Corning's "Relatively
                          Constant" Data Lack Merit, Because All Fast-Curing
                          Films Have Such "Relatively Constant" Data................53

        D.    The PTAB Established Its Own Erroneous Notion of the Cure Dose
              Limitation, Which it Imports Into the Claims .....................................57

        E.    The PTAB's Flawed Analysis Also Includes Relying on DSM Data
              that It Previously Discredited .............................................................60

CONCLUSION ......................................................................................................64

ADDENDUM

PROOF OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
   776 F.2d 281 (Fed. Cir. 1985) ........................................................49

*Cisco Sys., Inc. v. Lee*,
   557 Fed. Appx. 963 (Fed. Cir. 2014),
   *cert. denied*, 135 S. Ct. 377 (2014)................................................37

*CSR, PLC v. Skullcandy, Inc.*,
   ___ Fed. Appx. ___, Nos. 2014-1108, 2014-1109, 2014-1138,
   2014 WL 7101560 (Fed. Cir. Dec. 16, 2014)................................33

*C.W. Zumbiel Co. v. Kappos*,
   702 F.3d 1371 (Fed. Cir. 2012) ....................................................30

*Flo Healthcare Solutions, LLC v. Kappos*,
   697 F.3d 1367 (Fed. Cir. 2012) ....................................................37

*Gechter v. Davidson*,
   116 F.3d 1454 (Fed. Cir. 1997) ...............................................33, 34

*In re Abbott Diabetes Care, Inc.*,
   696 F.3d 1142 (Fed. Cir. 2012) ...............................................30, 34

*In re Huai-Hung Kao*,
   639 F.3d 1057 (Fed. Cir. 2011) .................................. 30-31, 57, 58

*In re Morris*,
   127 F.3d 1048 (Fed. Cir. 1997) ....................................................34

*In re Paulsen*,
   30 F.3d 1475 (Fed. Cir. 1994) ......................................................34

*In re Van Geuns*,
   988 F.2d 1181 (Fed. Cir. 1993) ....................................................35

*Leo Pharm. Prods., Ltd. v. Rea*,
    726 F.3d 1346 (Fed. Cir. 2013) ....................................................................37

*Panduit Corp. v. Dennison Mfg. Co.*,
    810 F.2d 1561 (Fed. Cir. 1987) ....................................................................32

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ....................................................................35

*Smith & Nephew, Inc. v. Rea*,
    721 F.3d 1371 (Fed. Cir. 2013) ...............................................................30, 31

*Tempo Lighting, Inc. v. Tivoli, LLC*,
    742 F.3d 973 (Fed. Cir. 2014) ......................................................................37

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
    574 U.S. ___, 135 S. Ct. 831 (2015) .............................................................30

*Yorkey v. Diab*,
    601 F.3d 1279 (Fed. Cir. 2010) ....................................................................35

## FEDERAL CODES, STATUTES, AND RULES

28 U.S.C. § 1295(a)(4)(A) .................................................................................1

35 U.S.C. § 6(b)(4)..............................................................................................1

35 U.S.C. § 102 ...............................................................................................7, 33

35 U.S.C. § 103 ....................................................................................................7

35 U.S.C. § 141(c) ...............................................................................................1

35 U.S.C.  § 316(c) ..............................................................................................1

37 C.F.R. § 42.100(b) ........................................................................................34

Federal Circuit Rule 47.4 ......................................................................................i

Federal Circuit Rule 47.5 .....................................................................................ix

# TABLE OF ABBREVIATIONS

| Parties | |
|---|---|
| Corning | Petitioner-Appellant Corning Incorporated |
| DSM | Patent Owner-Appellee DSM IP Assets B.V. |

| Terms | |
|---|---|
| '103 Patent | U.S. Patent No. 7,171,103 to van Eekelen et al. (Ex. 1001) |
| '508 Patent | U.S. Patent No. 6,961,508 to van Eekelen et al. |
| A__ | Joint Appendix at page(s), with (column:lines) for patents |
| Appeal | Federal Circuit Case No. 2015-1152 captioned *Corning Incorporated v. DSM IP Assets B.V.* |
| BRI | Broadest Reasonable Interpretation |
| Chawla | Chawla, et al., "Development and Characterization of Novel UV-Curable Optical Fiber Coatings," *International Wire & Cable Symposium Proceedings*, 1993 (Ex. 1050) (A2187-A2193) |
| Corning's Reply | Corning's Reply to Patent Owner Response filed November 27, 2013 in IPR2013-00043 (Paper 64) |
| Court | United States Court of Appeals for the Federal Circuit |
| Cure Dose Limitation | Limitation in claims 1-18 of the '103 Patent, wherein it recites "a cure dose to attain 95% of the maximum attainable modulus of less than 0.65 J/cm$^2$" |
| Decision Instituting IPR | Decision Institution of *Inter Partes* Review 37 C.F.R. § 42.108 issued by the PTAB on May 13, 2013 in IPR2013-00043 (Paper 14) |
| Decision on Rehearing | Decision on Corning's Revised Requests for Rehearing 37 C.F.R. § 42.71(d)(2) issued by the PTAB on August 12, 2014 in IPR2013-00043 (Paper 104) |
| Final Decision | Final Written Decision 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73(b) issued by the PTAB on May 1, 2014 in IPR2013-00043 (Paper 95) |
| IPR | *Inter Partes* Review |
| Petition | Corning's Petition for *Inter Partes* Review of the '103 Patent filed November 15, 2012 in IPR2013-00043 (Paper 3) |

| Terms | |
|---|---|
| PO Response | Patent Owner's Response Under 37 C.F.R. § 42.120 to Corning's Petition for *Inter Partes* Review of Claims 1–18 of the '103 Patent filed August 26, 2013 in IPR2013-00043 (Paper 43) |
| Preliminary Response | Patent Owner's Preliminary Response under 37 C.F.R. § 42.107 to Petition for *Inter Partes* Review of the '103 Patent filed February 21, 2013 in IPR2013-00043 (Paper 13) |
| PTAB | The Patent Trial and Appeal Board of the United States Patent and Trademark Office |
| Request for Rehearing | Corning's Request for Rehearing under 37 C.F.R. § 42.71(d) filed June 27, 2014 in IPR2014-00043 (Paper 100) |
| Szum '157 | WO 98/21157 to Szum et al. (Ex. 1002) |
| Szum '041 | U.S. Patent No. 5,664,041 to Szum (Ex. 1003) |
| Winningham | WO 01/49625 to Winningham (Ex. 1005) |
| Yamazaki | European Patent Application No. 0 874 012 A1 to Yamazaki et al. (Ex. 1004) |

All emphasis in this brief is added unless otherwise indicated.

# STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Corning states that there is no other appeal in or from the same civil action or proceeding in the lower court or body that was or is before this or any other appellate court.

The following cases currently pending in this Court may directly affect, or be directly affected by, the Court's decision in this Appeal, which pertains to the '103 Patent. The '508 Patent, also owned by DSM, is related to the '103 Patent; the application from which the '103 Patent issued is a continuation of the application from which the '508 Patent issued. The '508 Patent is the subject of IPR2013-00044, which is entitled *Corning Incorporated v. DSM IP Assets B.V.* The PTAB issued one Final Decision for both the '103 Patent and the '508 Patent. On October 10, 2014, Corning timely filed notices of appeal with this Court of the Final Decision for this Appeal and in IPR2013-00044. On motion by Corning, on January 5, 2015, this Court agreed to treat this Appeal and the appeal for IPR2013-00044, Docket No. 2015-1162, as companion cases.

On August 21, 2014, Corning commenced a declaratory judgment action against DSM and DSM Desotech, Inc. in the United States District Court for the District of Delaware, Case No. 14-cv-01081, entitled *Corning Incorporated v. DSM Desotech, Inc. and DSM I.P. Assets B.V.*, seeking, *inter alia*, a declaration that Corning does not infringe the '103 Patent and the '508 Patent, and that the

'103 Patent and the '508 Patent are invalid.  In addition, on or about October 16, 2014, DSM and DSM Desotech, Inc. commenced an action against Corning in the United States District Court for the Northern District of Illinois, Case No. 14-cv-08111, entitled *DSM Desotech, Inc. and DSM I.P. Assets B.V. v. Corning Incorporated*, alleging, *inter alia*, that Corning will, has been, and/or is directly infringing and/or inducing infringement of and/or contributorily infringing claims of the '103 Patent and the '508 Patent.  On or about January 8, 2015, DSM and DSM Desotech, Inc. filed an action against Momentive Specialty Chemicals Inc. and Momentive UV Coatings (Shanghai) Co., Ltd. in the United States District Court for the Southern District of Ohio, Case No. 15-cv-00070, entitled *DSM Desotech, Inc. and DSM I.P. Assets B.V. v. Momentive Specialty Chemicals Inc. and Momentive UV Coatings (Shanghai) Co., Ltd.*, alleging, *inter alia*, that the defendants infringed the '103 Patent and the '508 Patent.

Other than the aforementioned cases, there are no other cases known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the Appeal.

## STATEMENT REQUESTING ORAL ARGUMENT

Oral argument is respectfully requested.

## STATEMENT OF JURISDICTION

This Appeal arises from the following action in the PTAB: *Corning Incorporated v. DSM IP Assets B.V.*, IPR2013-00043 and relates to claims 1-18 of the '103 Patent.

The PTAB entered a Final Decision on May 1, 2014, and a Decision on Rehearing on August 12, 2014, rejecting Corning's challenge to claims 1-18. This Appeal involves the Final Decision and Decision on Rehearing and all findings, orders, decisions, rulings, and opinions underlying the Final Decision and Decision on Rehearing.

The PTAB had subject matter jurisdiction over the underlying case pursuant to 35 U.S.C. §§ 6(b)(4) and 316(c). This Court has jurisdiction pursuant to 35 U.S.C. § 141(c) and 28 U.S.C. § 1295(a)(4)(A). Corning timely filed a Notice of Appeal on October 10, 2014. No cross appeal was filed by DSM.

## STATEMENT OF THE ISSUES

(1)    Did the PTAB err in failing to apply the BRI to the Cure Dose Limitation of the claims of the '103 Patent?

(2)    Did the PTAB err in requiring that Corning's experimental data satisfy a statistical limitation that is not claimed, let alone mentioned, in the '103 Patent specification?

(3)    Did the PTAB err, based on flawed analysis, in deciding that Corning failed to show two prior art compositions met the Cure Dose Limitation and, therefore, rendered all '103 Patent claims unpatentable?

## STATEMENT OF THE CASE

### A.    Introduction

This Appeal arises from Corning's IPR Petition, challenging the patentability of all claims of the '103 Patent.  A115.  Corning replicated and tested two prior art coating compositions—Examples 10-1 and 10-2 from *DSM's own prior art patent application*, Szum '157.  A1271-A1275 ¶¶5-13; A1279-A1288 ¶¶22-52.  Neither the PTAB, nor DSM in its PO Response, raised any issue with regard to Corning's replication of those examples; and neither the PTAB, nor DSM expressed concern about Corning's testing of those examples for other properties in the claims of the '103 Patent.  The only issue DSM and the PTAB raised was whether Corning properly demonstrated that Examples 10-1 and 10-2 met the claim limitation calling for an inner primary coating composition having "a cure dose to attain 95% of the maximum attainable modulus of less than 0.65 J/cm$^2$"— *i.e.*, the Cure Dose Limitation.  A45, 13:18-33; A448-A449; A22-A23.

The Cure Dose Limitation is a measure of the speed at which the subject composition cures, by determining its modulus (*i.e.*, stiffness) after exposure to different doses of UV radiation (measured in J/cm$^2$).  A43, 9:23-32; A1200-A1201 ¶¶68-69; A1282-A1283 ¶¶29-31.  Nowhere do the claims of the '103 Patent specify a procedure for determining whether the Cure Dose Limitation is met.  There are a number of scientifically accepted methods for measuring cure dose.

A1200-A1201 ¶68.  The specification of the '103 Patent describes *one* such procedure for making this determination.  A43, 9:21-44.  When Corning followed that procedure, it demonstrated that Examples 10-1 and 10-2 met the Cure Dose Limitation in the '103 Patent claims.  A1210 ¶92; A1283 ¶31; A1431 ¶¶31-32.

DSM challenged Corning's Cure Dose Limitation data by presenting its own testing data for Examples 10-1 and 10-2.  *See* A449-A452.  However, DSM chose not to follow the test procedure set forth in its own '103 Patent's specification (*see* A1432 ¶33), presumably because doing so would have corroborated Corning's testing.  Instead, DSM presented skewed test results using a much thicker coating than that identified in the specification.  *See* A1432 ¶33.  This had the effect, relative to Corning's test, of artificially slowing cure speed (as evidenced by reduced modulus values at given doses), so that DSM's results were outside the scope of the '103 Patent claims.  *See* A1432-A1433 ¶34.

DSM then parlayed its skewed test results to further advantage based on a goodness of fit (*i.e.*, $R^2$) statistical analysis of dose-modulus curves.  There is nothing in the '103 Patent that requires or suggests an $R^2$ analysis is necessary or even proper (A1431 ¶30), but DSM nevertheless relied on that analysis to argue that DSM's data was proper, while Corning's was flawed.  *See* A453-A455.

Corning's coating having a thickness in accordance with the '103 Patent specification, cured faster than DSM's thicker coatings.  As a result, Corning's

modulus values at the doses specified in the '103 Patent were all in the plateau region of the curve, indicating that the coating was almost fully cured even at the lowest experimental dose specified.  *See* A1453-A1457 ¶¶73-80.

It is undisputed that dose-modulus curves have an exponential shape that pass through the origin point (*i.e.*, 0 dose, 0 modulus).  A1458-A1459 ¶84; A3705-A3712 ¶¶116-117; A1859, 1097:8-21.  Logically, by not including the origin in an exponential curve through Corning's data, DSM deprived the plot of its expected exponential character, giving that plot a goodness of fit value (*i.e.*, $R^2$) to an exponential curve an artificially low value.

DSM introduced $R^2$ into consideration despite the '103 Patent's failure to mention it, in order to parlay its thicker coating test results into a further contrived attack on Corning's testing based on irrelevant statistics.  In particular, DSM's tests with thicker films *slowed* the cure, resulting in both lower modulus values at a given dose and giving the dose-modulus curve a higher $R^2$ value without considering the origin.  *See* A1453 ¶72; A1458-A1459 ¶¶83-85.  This afforded DSM the opportunity to assert that its higher $R^2$ results provided a contrived statistical basis to accept DSM's test results and not Corning's.  However, this required DSM to ignore the test disclosed in the '103 Patent specification (and as used by Corning).  The artificially low $R^2$ value DSM assigns to Corning's testing has no relation to the actual fit of the data, as clearly evidenced by the close

5

proximity of the data points to the exponential-shaped dose-modulus curve. A2952; A2953; *see also* A1453-A1454 ¶73. That low value also has no relationship to reality, because, at a dose of zero, the modulus is undisputably zero. A1458-A1459 ¶84; A1859, 1097:22-25.

The PTAB recognized that DSM's testing with a thicker coating was different than Corning's and did not accept DSM's testing. A25-A27. However, it was led astray by DSM's $R^2$ argument and inexplicably relied on those same unaccepted test results to conclude that Corning's data was unreliable.

In ruling against Corning, the PTAB failed to explicitly construe the meaning of the Cure Dose Limitation, let alone follow the BRI standard. It relied on DSM's flawed, outcome-altering $R^2$ arguments, despite the fact that nowhere in the '103 Patent is there any requirement for an $R^2$ analysis, let alone any indication of how that analysis should be performed or what $R^2$ values are acceptable or unacceptable.

By engrafting an undisclosed and unclaimed $R^2$ statistical value into the claims, the claims no longer cover coatings that form the object of the '103 Patent—fast-curing coatings. A claim construction that leads to this anomalous result after failing to follow basic tenets for interpreting claims simply cannot stand.

### B.    Procedural History

On November 15, 2012, Corning filed its Petition, requesting IPR with respect to all claims of the '103 Patent.  Corning identified four prior art references in its Petition—Szum '157 (the primary reference), Szum '041, Yamazaki, and Winningham—as overcoming any supposed deficiencies of the prior art evaluated during original prosecution of the application that issued as the '103 Patent, under 35 U.S.C. §§ 102 and 103.  A115.

DSM filed a Preliminary Response on February 21, 2013.  In doing so, DSM did not provide any claim construction for the Cure Dose Limitation.  Instead, DSM stated that "the Board's determination of the appropriate scope of these claim terms is not necessary," and objected to Corning's proposed claim constructions to the extent that they did not correspond to the BRI.  A230.

On May 13, 2013, the PTAB granted Corning's Petition regarding all claims of the '103 Patent based on both anticipation and obviousness grounds.  A237-A238.  The PTAB made no explicit claim construction in the Decision Instituting IPR.  A239-A241.

On August 26, 2013, DSM filed its PO Response, in which it presented its own data resulting from its replication and testing of Szum '157's Examples 10-1 and 10-2 for the Cure Dose Limitation.  DSM also criticized Corning's testing for Examples 10-1 and 10-2 on statistical grounds.  A453-A455.  The PTAB issued its

7

Final Decision on May 1, 2014, denying Corning's request to cancel claims 1-18. A28.

On June 27, 2014, Corning filed a Request for Rehearing, asking the PTAB to reconsider its Final Decision regarding claims 1-18 of the '103 Patent. On August 12, 2014, the PTAB issued its Decision on Rehearing, in which it declined to modify its Final Decision. A35.

Corning now appeals the PTAB's determination that Corning failed to demonstrate that claims 1-18 of the '103 Patent are unpatentable.

### C.     Statement of the Facts

#### 1.     The '103 Patent

The '103 Patent is directed to a coated optical fiber and optical fiber coating compositions having various properties. A115; A45, 13:17-14:44. These properties include *in situ* modulus, cure dose to attain 95% of the maximum attainable modulus (the Cure Dose Limitation), modulus retention ratio after hydrolytic aging, glass transition temperature, elongation at break, and tensile modulus. A115-A116.

Claim 1 is a representative independent claim in the '103 Patent and reads as follows:

1.     An inner primary coating composition having:

(a) an in-situ modulus (after cure) of less than 0.6 MPa;

(b) <u>a cure dose to attain 95% of the maximum attainable modulus of less than 0.65 J/cm$^2$</u> [the "Cure Dose Limitation"]; and

(c) a modulus retention ratio (after cure) of at least 0.6 after hydrolytic aging; wherein said composition comprises:

      (i) 20-98 wt. % relative to the total weight of the composition of a radiation curable urethane (meth) acrylate oligomer having polyether polyol backbone;

      (ii) 0-80% wt. % relative to the total weight of the composition of one or more reactive diluents;

      (iii) 0.1-20 wt. % relative to the total weight of the composition of one or more photoinitiators; and

      (iv) 0-5 wt. % relative to the total weight of the composition of additives.

A45, 13:18-33.

Because optical fibers are fragile and easily broken, optical fibers are usually coated with a protective coating system, including a soft "cushioning" *primary coating* contacting the fiber and a relatively hard *secondary coating* surrounding the primary coating.  A39, 1:22-26.  Providing such coatings should, however, not be at the expense of the cure speed of coating compositions.  A39, 1:29-31.  Accordingly, one of the objects of the '103 Patent is to provide a coated optical fiber having a primary coating and a secondary coating, where the primary coating has a high cure speed and provides good microbending resistance.  A39, 1:33-37.

## 2.    The Cure Dose Limitation

The language of the Cure Dose Limitation broadly speaks of an appropriate cure dose, without specifying any particular details or procedure for its determination.  A576-A577; A45, 13:18-14:44; A1426-A1427 ¶¶22-24.  There are no limitations in the claims requiring how to cure the coating, how to measure the dose needed to attain 95% of the maximum attainable modulus, or the manner in which the modulus of the coating is to be determined at various doses.  A576; A45, 13:18-14:44; A1426-A1427 ¶¶22-24.  DSM's expert witness, Dr. Christopher N. Bowman, agreed that the claims lack these limitations.  A576-A577; A1629-A1633, 476:13-492:16; A1632, 489:18-21.

## 3.    Method for Determining the Cure Dose Limitation

The cure speed of a composition is determined as the cure dose required to attain 95% of the maximum attainable modulus.  A43, 9:23-25.  Thus, modulus values are a measure of the extent to which a composition is cured at a given dose of UV radiation.  The specification of the '103 Patent only describes one approach for assessing what cure dose is needed to attain 95% of the maximum attainable modulus.  A577; A43, 9:21-44.  The specification describes a test that involves preparing six radiation-cured sample films by "applying an approximately 75 microns thick composition"; curing the composition "with a different dose: 0.2, 0.3, 0.5, 0.75, 1.0, and 2.0 J/cm$^2$ respectively"; subjecting specimens of each cured

sample film to modulus testing; creating a dose-modulus curve by "plotting the modulus values vs. the dose and by fitting a curve through the data points"; and determining the cure dose "at which 95% of the ultimate secant modulus is attained." A43, 9:21-44.

The details of how to perform these various steps of the cure dose test—particularly, how to plot the modulus values vs. the dose, fit a curve through the data points, and determine the dose at which 95% of the ultimate secant modulus is attained—are not described in the '103 Patent. *See* A43, 9:21-44. Corning plotted its dose-modulus data to an exponential shape. *See, e.g.*, A3548, 744:14-745:25. DSM's expert, Dr. Bowman, gives the exponential equation as $y = a[1\text{-e}^{-b(x-c)}]$, and acknowledges that such data fits to an exponential equation. *See* A3705-A3707 ¶116. This function mathematically will extend from the 0,0 point.[1]

In the dose-modulus curves for Examples 10-1 and 10-2 from both Corning (A2952; A2953) and DSM (A3935; A3946; A3957; A3968), the curves start at the 0,0 point (*i.e.*, where 0 dose = 0 modulus), rise up from the 0,0 point to the measured modulus data points, and then level off or plateau as the dose becomes greater (*i.e.*, moving from left to right along the x-axis as the dose increases). A1666, 535:19-537:8; A1859, 1097:8-1098:21. The notable difference between

---

[1] As Dr. Bowman acknowledges, $c$ = inhibition time which is 0. A3705-A3707 ¶ 116; A3706 fn.3. Therefore, at time = 0 (x=0), $e^{-b(x-c)} = e^0 = 1$, then y=a[1-1] = 0. Thus, the formula is predicated on a starting point of 0,0. A1859, 1097:8-21.

Corning's dose-modulus curves and DSM's curves is that Corning's curves have a sharper (*i.e.*, rapid) rise than DSM's (*i.e.*, the modulus values of the samples Corning tested were higher at lower doses than DSM's samples).  A1452 ¶70; A1453 ¶72; A1860, 1101:25-1102:19.

### 4.    $R^2$ Values

Neither the $R^2$ or the "goodness of the fit" of the data to the curve (A3716-A3717 ¶122), nor any other type of statistical analysis, is mentioned in the '103 Patent.  One of the objects of the '103 Patent is a fast-curing film.  *See, e.g.*, A39, 2:28-32; A43, 9:23-25 (referring to "high cure speed").  As Dr. Reichmanis explained, fast-curing films will have all of the experimental data points in the "plateau region" of the dose-modulus curve because, even at low cure doses, the coating will be close to fully cured.  A1453-A1455 ¶¶72-75; A1457 ¶81; A1459 ¶85.

As a matter of logic, with dose-modulus plots having an exponential shape and fast-curing films having all data points called for in the '103 Patent on the plateau of that curve, inclusion of the 0,0 point in the plot for fast-curing films is needed to give it an exponential character.  In other words, a plot with the 0,0 point will "fit" better to an exponential function (*i.e.*, achieve a higher $R^2$ value) than a plot without the 0,0 point.

Likewise, a low $R^2$ for a plot excluding the 0,0 point does not mean that the data is flawed; it simply means that the data does not have a good "fit" to an exponential equation, since there are no data points in the rapid rise portion of the curve.  As Dr. Reichmanis explained "what matters is what dose is required to attain 95% of the maximum attainable modulus and not how well the curve fits to the data" (A1459 ¶85), and there is nothing in the '103 Patent that indicates that $R^2$ is a relevant consideration regarding the Cure Dose Limitation.  Corning's data points (the six points resulting from the six cure doses identified in the '103 Patent specification) plainly "fit" to the curve.  *See* A1453-A1459 ¶¶72-85.

### 5.    IPR Proceedings

#### a.    Corning's Petition

In its Petition, Corning demonstrated that all of the properties of the coated optical fiber and primary coating compositions claimed in the '103 Patent were met by the prior art.  A117.  In addition to demonstrating that Examples 10-1 and 10-2 of Szum '157 met the Cure Dose Limitation, Corning also demonstrated through testing that prior art coatings met the other material properties claimed in the '103 Patent.  A148-A167.  In its PO Response, DSM did not challenge Corning's testing other than for the Cure Dose Limitation.  A447-A448.  The PTAB did not substantively discuss these other properties, and stated that the Cure Dose Limitation is the "dispositive" claim limitation in the '103 Patent.  A8.

In showing that Examples 10-1 and 10-2 met the Cure Dose Limitation, Corning followed the procedure set forth in the '103 Patent specification, even though the claims did not require use of that particular procedure. A1282-A1283 ¶¶29-31; A1200-A1201 ¶¶68-70; A1433-A1434 ¶¶35-37. Through that testing, Corning demonstrated that the Cure Dose Limitation was met by Examples 10-1 and 10-2, which have a cure dose of 0.37 $J/cm^2$ and 0.22 $J/cm^2$, respectively, to attain 95% of the maximum attainable modulus. A137; A1283 ¶31; A1201 ¶70; A1210 ¶92; A1434 ¶¶35-37.

### b.    DSM's PO Response

In its PO Response, DSM only challenged Corning's testing for the Cure Dose Limitation. A447-A448.

DSM did not present testimony from any witnesses who conducted or even supervised the experimental work by DSM. Instead, Dr. Bowman testified that DSM made Examples 10-1 and 10-2 and tested them for the Cure Dose Limitation. A3702-A3712 ¶¶109-118. According to Dr. Bowman, DSM's testing demonstrated that Examples 10-1 and 10-2 "were found to have cure doses to attain 95% of the maximum attainable modulus of more than 0.65 $J/cm^2$, which is outside the claimed range." A448-A449, citing A3688-A3689 ¶69. DSM argued that its experimental results showed that Corning's results were not correct. A3712 ¶¶117-118.

Critically, DSM obfuscated its own experimental activity by not reporting the thickness of the pre-cured coating samples it tested for the Cure Dose Limitation and its failure to follow the procedure described in the specification of the '103 Patent and used by Corning. *See* A1432 ¶33. Only during cross-examination did Dr. Bowman admit that DSM did not use 75-micron thick film samples and did not follow the procedure described in the specification of the '103 Patent. A1778, 866:17-24. Dr. Bowman did not ask anyone at DSM why they did not follow the description in the '103 Patent specification. A1780, 873:6-18. However, the result is clear: DSM used thicker films, which was contrary to the '103 Patent specification, in order to achieve cure dose test results outside those called for in the '103 Patent claims. A1451-A1453 ¶¶68-71; A3705 ¶115; A3713-A3716 ¶121; A1860, 1101:25-1102:19. An example of one of DSM's dose-modulus curves is below:



**Figure 1 (A3708)**

DSM also relied on a statistical analysis nowhere explained, and certainly not required by the '103 Patent claims. In particular, Dr. Bowman stated that he was "immediately suspicious of the $R^2$ values (*i.e.*, an indication of the goodness of the fit) reported" in Corning's test documents. A3716 ¶122. Dr. Bowman claimed that his suspicions were based on the fact that Corning's data "plainly looks relatively constant." A3717 ¶123.[2]

DSM performed curve fits on Corning's cure dose data, and, using its own method to recalculate Corning's $R^2$, DSM determined the $R^2$ values for Corning's

---

[2] There are no exemplary cure-dose testing results or dose-modulus curves in the '103 Patent for comparison purposes.

16

curves for Examples 10-1 and 10-2 as 0.5728 and 0.4656, respectively, rather than the $R^2$ values of 0.9765 and 0.8958, respectively, that Corning reported.  *See* A3718-A3719 ¶125.  Despite the absence of any indication in the '103 Patent claims or specification that an $R^2$ value should be considered at all, let alone what values were sufficient and what ones were not, Dr. Bowman concluded "that Corning's data and curve fitting analysis are statistically invalid and cannot be used to accurately predict the cure dose to attain 95% of the maximum attainable modulus."  A3719 ¶126.

### c.    Corning's Reply

In its Reply to DSM's PO Response, Corning argued that the Cure Dose Limitation in the '103 Patent claims broadly identifies cure dose without specifying any particular details or procedure for its determination.  *See* A576-A578; A1426-A1427 ¶¶22-24.  Regarding DSM's argument about the importance of an $R^2$ analysis or statistical analysis generally, Corning pointed out that the Cure Dose Limitation is broad and contains no specific method of determining whether the limitation is met.  A576-A577; A1426-A1427 ¶¶22-24.

Corning asserted that there is no explicit instruction in the claims of how to cure the coating, how to measure the dose needed to attain 95% of the maximum attainable modulus, or the manner in which the modulus of the coating is to be determined at various doses.  *See* A576-A577; A1426-A1427 ¶¶22-24.  It was

noted that DSM's own expert witness agreed that the claims lack these features. *See* A576-A577; A1629-A1633, 476:13-492:16.

The specification of the '103 Patent describes *one* approach for assessing cure dose. *See* A43, 9:21-44. However, Corning argued that even this description is incomplete, because there is no explicit teaching in the specification regarding what curing apparatus, lamp, or lamp power to use to apply the different doses when carrying out the test. *See* A576-A578; A1428-A1431 ¶¶25-30. It was noted that the specification does not teach which type of radiometer is suitable for measuring dose. *See* A576-A578, citing A2213-A2217 ¶¶30-34. Corning noted that DSM's expert even agreed that the cure dose test method in the '103 Patent specification contains no explicit mention of equipment for curing. *See* A577; A1633, 493:3-494:25.

In addition to addressing claim construction issues with the Cure Dose Limitation, Dr. Reichmanis concluded that Corning's cure dose test results for Examples 10-1 and 10-2 were carried out in accordance with the procedures in the '103 Patent specification. A1433-A1434 ¶¶35-37. Dr. Reichmanis also disagreed with DSM's position that $R^2$ was relevant to consideration of Corning's cure dose test results, with DSM's recalculation of Corning's $R^2$ values omitting the 0,0 point, and with the manner in which DSM conducted its cure dose testing. A1437-A1441 ¶¶43-49; A1458-A1459 ¶¶83-85.

### (i)    $R^2$ Values

Dr. Reichmanis saw no merit in Dr. Bowman's criticisms of Corning's cure dose data based on the $R^2$ values, and pointed out that his criticisms were misleading.  A579-A580; A1453-A1459 ¶¶72-85.  According to Dr. Reichmanis, Corning's dose-modulus curves are "consistent with what I would expect for faster curing coatings (*e.g.*, coatings having a cure dose to attain 95% of the maximum attainable modulus of 0.37 J/cm$^2$ and 0.22 J/cm$^2$)."  A1453 ¶72.  Dr. Reichmanis reviewed, discussed, and attached four dose-modulus curves *prepared by DSM* of *other fast-curing, DSM-owned* coating formulations that had essentially the same shape as Corning's dose-modulus curves for Examples 10-1 and 10-2.  A1454-A1457 ¶¶74-80.  None of those DSM curves report $R^2$ values and all such curves went through the origin.  Given the nature of fast-curing films—that the films will be nearly fully cured at the lowest experimental dose—Dr. Reichmanis believed all fast-curing films will have relatively constant cure-dose moduli.  A1453-A1454 ¶¶72-73.  She stated that only means that they are fast curing, not that there was an issue with the testing.  *See* A1453-A1454 ¶73; A1457 ¶81.

Dr. Reichmanis believed that Dr. Bowman's reference to Corning's data as "relatively constant" (A3717 ¶123) is that "Corning's data points in its modulus vs. dose curves are, generally, aligned near the top of the curve" (A1453 ¶73) or the "plateau region" of the curve (A1859, 1098:12-21).  According to Dr. Reichmanis,

the reason that Corning's data points are along the top of the curve is because of the nature of the fast-curing coating compositions (A1457 ¶81), which is an object of the '103 Patent.  *See, e.g.*, A39, 2:28-32; A43, 9:23-25.

With reference to the annotated Figure A, below, Dr. Reichmanis testified that Corning's dose-modulus curves, which extend from the 0,0 point into a "rapid rise portion" and then to a "plateau region," are entirely consistent with what she would expect for a fast-curing film.  A1453 ¶72.  That is because, with fast-curing films, the films are almost completely cured at the lowest experimental dose provided in the description of the cure-dose test disclosed in the specification of the '103 Patent.  *See* A579; A1453-A1454 ¶ 73; *see also* A1860, 1100:24-1101:13.

Figure A



*See* A2953.

Thus, Dr. Reichmanis had no concerns about Corning's $R^2$ values as a measure of the "fit" of its data points to its curves. Regarding DSM's "recalculation" of Corning's $R^2$ values, excluding the origin as a data point, Dr. Reichmanis stated that doing so does not "make[] any statistical sense …. The 0,0 data point has to be present even though there is no actual data at a 0 J/cm$^2$ dose, because a skilled scientist would recognize that the modulus will be 0 (or close to 0) at a dose of 0 J/cm$^2$ …." A1458-A1459 ¶84. She noted that Dr. Bowman acknowledged that fact in his deposition. *See* A1859, 1097:22-1098:2. Moreover,

Dr. Reichmanis stated that if you exclude the 0,0 point, *all* fast-curing coatings will appear to have a low $R^2$ value, when fitted to an exponential function, as a result of the fact that the resulting data is all relatively constant, as all of the experimental data points appear on the plateau portion of the curve.  A1459 ¶85.

Dr. Reichmanis noted that Corning's dose-modulus curves looked like dose-modulus curves for other fast-curing films, including those prepared by DSM outside these proceedings.  A1453-A1457 ¶¶72-80.  In her view, a fast-curing film will have all of the data points on the plateau portion of the curve because the coatings are almost fully cured at the lowest experimental dose applied.  *See* A1453-A1454 ¶73; A1457 ¶81.

### (ii)    DSM's Cure Dose Tests

Dr. Reichmanis had concerns about DSM's testing, in particular the thickness of DSM's pre-cured film samples.  *See* A1432 ¶33; A1437 ¶43; A1440-A1441 ¶49.  DSM did not provide thickness data on its pre-cure film samples.  *See* A1432 ¶33; A1437-A1438 ¶¶43-44; A1440-A1441 ¶49.  However, "[b]ased on the *cured* film sample data provided by DSM," which showed that DSM's *cured* films were an average of 89 microns for Example 10-1 and 97 microns for Example 10-2 (A1439 ¶46), and the fact that curing *shrinks* films, Dr. Reichmanis determined the pre-cured film samples were "well above the approximately 75 micron thickness specified in the '508 and '103 patents for the wet, pre-cured film samples."  A1440

¶48. Thus, Corning argued DSM deviated from the test set forth in the '103 Patent specification to achieve different (and contrary) results.  A576; A1437 ¶43. According to Dr. Reichmanis, thicker films cure more slowly (requiring a higher cure dose to achieve comparable modulus) than thinner films (A1444-A1445 ¶56; A1446 ¶58), accounting for the differences between DSM's test results and Corning's test results.  A1432 ¶33.

### d.    The PTAB Issues Its Final Decision

On May 1, 2014, the PTAB issued its Final Decision denying Corning's request to cancel claims 1-18 of the '103 Patent.  The PTAB held that "Corning has failed to prove that prior art compositions inherently attain 95% of the maximum attainable modulus at a cure dose of less than 0.65 J/cm$^2$."  A8. Additionally, the PTAB stated that because it determined that Corning did *not* establish that Examples 10-1 and 10-2 inherently met the Cure Dose Limitation, "there is no occasion to construe further the language of [the Cure Dose Limitation]."  A8.

Regarding the statistical issue, the PTAB credited Dr. Bowman's testimony regarding $R^2$ over the testimony of Dr. Reichmanis.  A23.  Yet, without citing any factual support, the PTAB held that "[f]itting data points to a curve is important" and that "[t]he data points, when properly fitted to a curve, permit one skilled in the art to determine whether 95% of the maximum attainable modulus is attainable

at the relevant cure dose for a given composition." A24. Regarding how to calculate $R^2$, the PTAB stated that the '103 Patent does not "indicate that the data points are to include the origin (0,0 data point)." A24.

The PTAB also held that DSM failed to establish, through DSM's testing, that Examples 10-1 and 10-2 do *not* meet the Cure Dose Limitation. A23. On this issue, the PTAB credited Dr. Reichmanis over Dr. Bowman regarding the effect of the difference in coating thickness used by DSM compared to Corning. A25.

Noting that Corning has the burden of proof, however, the PTAB determined that a preponderance of evidence has not emerged on whether Examples 10-1 and 10-2 inherently describe a composition that met the Cure Dose Limitation (A27), and thus held against Corning. Though the PTAB rejected DSM's testing as a result of DSM using pre-cured coatings that were too thick (A25-A27), the PTAB inexplicably relied on DSM's testing data for Example 10-1 to support its ruling. A24-A25 ("As shown in Figure 1 [DSM's testing data for Example 10-1], the cure dose required to obtain 95% of the maximum attainable modulus was determined to be from 0.72 to 0.76 J/cm$^2$—a value outside the limits of claim 1 of the '103 patent.").

### e. Corning's Request for Rehearing and the PTAB's Decision on Rehearing

Corning requested rehearing, in which it argued that the PTAB's Final Decision was based on the following critical errors: (i) failing to construe the Cure

Dose Limitation; (ii) improperly importing curve fitting and $R^2$ limitations into the claims; (iii) failing to acknowledge that Corning's data alone, without any curve fitting or $R^2$ analysis, shows that Example 10-2 meets the Cure Dose Limitation; (iv) failing to acknowledge that Corning followed the '103 Patent specification for determining cure dose; (v) basing its conclusion on DSM data that the PTAB recognized to be unreliable; and (vi) having improperly credited Dr. Bowman's testimony regarding $R^2$ values.  A894-A910.

The PTAB denied Corning's request.  In doing so, it declined to construe the Cure Dose Limitation, stating that "it does not matter what 'cure dose' means because Corning … failed to establish that the compositions Corning made attained the '95%' property."  A32.

The PTAB also denied that it incorporated an $R^2$ requirement into the claims.  A33.  Rather, the PTAB stated that "our evaluation of $R^2$ values formed part of our analysis crediting Bowman over Corning's witnesses."  A33.  The PTAB did not address what level of $R^2$ would be necessary to meet the Cure Dose Limitation.

The PTAB also rejected Corning's point that its data alone, without curve fitting or $R^2$, satisfied the Cure Dose Limitation.  A33.  Without explaining how it impacted the decision, it held that it "did not credit" the testimony of Corning's

witnesses but instead credited the testimony of Dr. Bowman (even though Dr. Bowman did not address that issue in his testimony).  A33.

Finally, the PTAB rejected Corning's argument that the PTAB erred by relying on *DSM's cure dose data*, which the PTAB rejected as a result of DSM using films thicker than that set forth in the '103 Patent specification.  A34.  The PTAB did not address the portion of the Final Decision where it specifically relied on DSM's cure-dose data (A24-A25); the PTAB summarily stated that its Final Decision was based on "Corning's failure to prove its case."  A34.

# SUMMARY OF THE ARGUMENT

The first step in determining patentability is to construe the claims at issue. In construing claim terms, the PTAB is required to apply the BRI "in light of the specification of the patent." A8. The PTAB failed to comply with these requirements by not explicitly construing the Cure Dose Limitation, despite the fact that the PTAB's Final Decision clearly "turned" on what that limitation meant. When Corning challenged that failure on rehearing, the PTAB glibly stated that "it does not matter" what the Cure Dose Limitation means, because Corning failed to meet the limitation. A32. That determination is both circular and fatally defective. *Ab initio*, to decide whether a prior art reference renders a claim unpatentable, the scope of that claim must first be determined. The PTAB's failure to construe the claims alone warrants reversal.

The BRI of the Cure Dose Limitation *at least* includes the test method described in the '103 Patent specification. Corning followed that test and the results of the test show that Examples 10-1 and 10-2 met the Cure Dose Limitation. Moreover, the BRI of the Cure Dose Limitation would also include a review of the experimental data points Corning generated, without any requirement to fit a curve through those data points or to consider $R^2$ (or goodness of fit) at all. A review of Corning's raw data, standing alone, demonstrates that at least Example 10-2 met the Cure Dose Limitation.

Rather than apply the BRI to the Cure Dose Limitation, the PTAB improperly incorporated into that limitation, at least implicitly, a requirement that the data be derived from the experimental procedures set forth in the '103 Patent specification and, when expressed as an exponential dose-modulus curve, achieve some (undisclosed) level of $R^2$.  In so doing, the PTAB improperly narrowed the scope of the Cure Dose Limitation and thus did not apply the BRI.  Moreover, the PTAB failed to explain *what* $R^2$ value threshold was necessary to be considered sufficient for the Cure Dose Limitation.

Though the PTAB attempted to insulate its decision on this point by characterizing it as a factor that weighed on credibility, there is nothing in the '103 Patent that makes $R^2$ a relevant issue for consideration.  Only by improperly incorporating an $R^2$ requirement into the claims does this issue have any relevance at all.  That is a core claim construction issue that this Court reviews *de novo*, and should reverse.

Moreover, to the extent that the PTAB delved into the facts, its analysis was based on flawed reasoning.  This flawed analysis involved considering $R^2$ at all, failing to articulate what $R^2$ values were and were not sufficient to establish that the Cure Dose Limitation was met, and relying on an improper $R^2$ determination which ignored a dose-modulus value (*i.e.* the 0,0 point) that was undisputably and inherently present in every dose-modulus curve.  As the PTAB's factual

determinations proceeded from a flawed analysis, its determinations are not entitled to deference under the substantial evidence standard.

The '103 Patent's objective of fast-curing films cannot be harmonized with the PTAB's treatment of the Cure Dose Limitation. *All* fast-curing films, tested pursuant to the procedures in the '103 Patent specification, will have a low $R^2$ value when expressed as an exponential dose-modulus curve if the 0,0 point is excluded from the calculation. Given the undisputed fact that at a 0 dose the modulus will be, effectively, 0, and the fact that all of the experimental data points in a fast-curing film will be in the plateau region, the PTAB's requirement of an undisclosed but high $R^2$ while ignoring the 0,0 point results in the '103 Patent claims not encompassing fast-curing coating compositions, which are clearly an objective of that patent. This anomaly demonstrates that the PTAB's Final Decision is fatally flawed.

# ARGUMENT

## I.    STANDARD OF REVIEW

The PTAB's legal conclusions, including the PTAB's construction of claim

language, are reviewed *de novo*.  *C.W. Zumbiel Co. v. Kappos*, 702 F.3d 1371,

1381 (Fed. Cir. 2012); *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142, 1148 (Fed.

Cir. 2012).[3]

Generally, the PTAB's factual determinations are reviewed for substantial

evidence.  *C.W. Zumbiel Co.*, 702 F.3d at 1381; *In re Abbott Diabetes Care*, 696

F.3d at 1148.  Although the "'substantial evidence' standard of review requires a

deferential approach to the Board's findings," such deference is unwarranted where

the decision "was mainly the result of . . . analytical errors."  *Smith & Nephew, Inc.*

*v. Rea*, 721 F.3d 1371, 1380 (Fed. Cir. 2013) (citation omitted).  Factual findings

are unsupported by substantial evidence where the PTAB based such findings on

"erroneous reasoning in making the factual determinations."  *In re Huai-Hung*

---

[3] *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 574 U.S. ___, 135 S. Ct. 831
(2015), does not change the above analysis.  *Teva* arises from a district court
determination where the BRI standard is not applicable.  Thus, *Teva* is not
controlling here.  Moreover, in *Teva*, the Supreme Court confirmed the *de novo*
standard of review "[w]hen the district court reviews only evidence intrinsic to the
patent (the patent claims and specifications, along with the patent's prosecution
history)."  *Id.* at 834.  But, where the district court makes factual findings
regarding extrinsic evidence, such "subsidiary factfinding must be reviewed for
clear error."  *Id.* at 841.  No "subsidiary factfinding" regarding extrinsic evidence
on the meaning of a claim limitation is at issue in this Appeal; the PTAB declined
to explicitly construe the Cure Dose Limitation.

*Kao*, 639 F.3d 1057, 1065 (Fed. Cir. 2011); *see also Smith & Nephew, Inc.*, 721 F.3d at 1380.[4]

## II.    TO THE EXTENT THE PTAB DID CONSTRUE THE CURE DOSE LIMITATION, THAT CONSTRUCTION WAS UNDULY NARROW AND IMPROPERLY IMPORTED LIMITATIONS NOT FOUND IN THE '103 PATENT

Without conducting any *explicit* claim construction of the Cure Dose Limitation, the PTAB stated that "Corning has failed to prove that prior art compositions inherently attain 95% of the maximum attainable modulus at a cure dose of less than 0.65 J/cm[2]." A8.  In concluding its inaptly named "Claim Construction" section, the PTAB stated that "[a]ccordingly, there is no occasion to construe further the language of [the Cure Dose Limitation]."[5]  A8.  Additionally, in its Decision on Rehearing, the PTAB stated "it does not matter what 'cure dose' means because Corning … failed to establish that the compositions Corning made attained the '95%' property."  A32.  The PTAB's failure to construe the Cure Dose Limitation or at least to detail that construction is grounds for reversal.

Moreover, without explicitly construing the Cure Dose Limitation, the PTAB implicitly imported into that limitation a requirement that any data

---

[4] Even if this Court were to review the record under the substantial evidence standard, there is not substantial evidence to support the PTAB's rejection of Corning's experimental data and incorporation of an R[2] requirement.

[5] Though the PTAB's use of the term "further" suggests that it did perform some claim construction, no such construction of the Cure Dose Limitation appears in the Final Decision.

generated achieve some undisclosed $R^2$ value as a measure of curve fitting.

Importing into the claims a requirement to consider $R^2$ and to achieve some

unspecified $R^2$ value, when the '103 Patent is silent about an $R^2$ analysis, unduly

and improperly narrows the breadth of the Cure Dose Limitation and thus is not the

BRI of that limitation.  Accordingly, the PTAB's apparent claim construction of

the Cure Dose Limitation should be reversed.

**A.    The PTAB Is Required to Construe the Claims of the Patent and Apply the BRI to the Claims**

**1.    The PTAB Improperly Failed to Explicitly Construe the "Dispositive" Cure Dose Limitation**

Construing claims is a critical aspect of patent law that must be performed

before determining validity.  *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561,

1567 (Fed. Cir. 1987).  This is particularly true for a claim term deemed by the

PTAB to be "dispositive."  *See* A8.  Notwithstanding its characterization of the

Cure Dose Limitation as "dispositive," the PTAB failed to articulate any claim

construction of the Cure Dose Limitation.  Accordingly, the Final Decision should

be reversed.

Compounding this error, in its Decision on Rehearing, the PTAB stated that

"it does not matter what 'cure dose' means because Corning … failed to establish

that the compositions Corning made attained the '95%' property."  A32.  The

PTAB's "reasoning" is fatally circular:  the PTAB determined that it is not

necessary to construe the dispositive claim term, because Corning had not satisfied

the claim term, because Corning's evidence did not meet some undisclosed $R^2$

value that the PTAB read into the Cure Dose Limitation.

This Court has long required the PTAB to supply a "sufficient explanation

for their decisions so that those decisions may be judged against the relevant

statutory standards, and that failure to provide such an explanation is grounds for

striking down the action." *Gechter v. Davidson*, 116 F.3d 1454, 1459 (Fed. Cir.

1997) (quotation marks and citation omitted).  In reversing the PTAB's

determination under 35 U.S.C. § 102, this Court in *Gechter* held:

> the Board's opinion lacks a claim construction, makes conclusory
> findings relating to anticipation, and omits any analysis on several
> limitations.  For example, the Board opinion does not separately
> construe the term "agent status messages" before finding that [the
> prior art] discloses just such "agent status messages."

*Id.* at 1460.  Critically, the Court noted that, while "[t]he parties contest these

[claim construction] issues on appeal, [ ] the relevant findings were omitted from

the Board's opinion." *Id.*  "In sum, we hold that the Board is required to set forth

in its opinions specific findings of fact and conclusions of law adequate to form a

basis for our review…. Claim construction must also *be explicit*, at least as to any

construction disputed by parties to the interference (or an applicant or patentee in

an *ex parte* proceeding)." *Id.* at 1460; *see also CSR, PLC v. Skullcandy, Inc.*, ___

Fed. Appx. ___, Nos. 2014-1108, 2014-1109, 2014-1138, 2014 WL 7101560, at *5

(Fed. Cir. Dec. 16, 2014) (in *inter partes* reexamination PTAB erred when it "failed to construe [the dispositive claim term] in a manner that would permit meaningful appellate review").[6]

Here, the PTAB characterizes the Cure Dose Limitation as "dispositive." A8. Yet, the PTAB supplies no claim construction in the Final Decision and, incredibly, in its Decision on Rehearing states that the meaning of the claims "does not matter." A32. That is not the law and requires reversal.

### 2.    The PTAB Is Required to Apply the BRI to Claim Terms

Pursuant to 37 C.F.R. § 42.100(b), the PTAB's own rules require it to give claims the BRI. *See In re Abbott Diabetes Care, Inc.*, 696 F.3d at 1148. The words of claims should be "interpreted according to their broadest reasonable construction in light of the specification of the patent." A8; *see also In re Morris*, 127 F.3d 1048, 1054-55 (Fed. Cir. 1997).

Moreover, although an inventor may "define the specific terms used to describe his or her invention, this must be done with reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a definition, however, limitations are not to be read into the

---

[6] In its Decision on Rehearing, the PTAB tried to sidestep the requirement of construing claims, noting that "'patentability,' not 'validity,' is an issue in an [IPR] proceeding." A32. Yet, in *Gechter*, this Court squarely rejected that dodge, equating reviews of "patentability" and "validity." *Gechter*, 116 F.3d at 1459.

claims from the specification. *See In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

Additionally, the PTAB may rely on testimony from persons of skill in the art "to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc). Expert testimony, however, may not result in a claim construction contrary to the claim construction mandated by intrinsic evidence. *Id.* Thus, while this Court defers to the PTAB's findings concerning the credibility of expert witnesses, *see Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010), the PTAB's reliance on expert testimony cannot result in a claim construction that varies from a construction dictated by intrinsic evidence.

### B.   The PTAB Improperly Narrowed the Cure Dose Limitation by Importing a Requirement that the Data Achieve an Undisclosed $R^2$ Value

There are numerous scientifically accepted methods of determining cure dose. A1200-A1201 ¶68. The BRI of the Cure Dose Limitation in the '103 Patent must *at least* include the test method described in the '103 Patent specification. Corning followed that test (*see* A578) and the results of the test show that Examples 10-1 and 10-2 met the Cure Dose Limitation (*see, e.g.*, A1282-A1283 ¶¶29-31). Moreover, the BRI of the Cure Dose Limitation would also include a review of the experimental cure-dose data points Corning generated, without any

requirement to fit a curve through those data points or to consider $R^2$ (or goodness of fit) at all.  A review of Corning's raw data, standing alone, demonstrates that at least Example 10-2 met the Cure Dose Limitation.  Accordingly, under a proper construction of the Cure Dose Limitation, Corning demonstrated that the prior art meets the limitation, and the PTAB's flawed Final Decision should be reversed.

From the Final Decision and Decision on Rehearing, it is not clear that the PTAB conducted a claim construction analysis.  If it did, then the PTAB certainly did not detail its claim construction in writing.  However, the PTAB's extensive reliance on an $R^2$ requirement and its finding against Corning on that basis demonstrate that the PTAB incorporated a requirement for an undefined $R^2$ value into the construction of the Cure Dose Limitation.  That improperly imports limitations into the Cure Dose Limitation and is thus not the BRI of that limitation.

The only reason the PTAB gives for discrediting Corning's data is based on the PTAB's inclusion of extra limitations relating to $R^2$ into the ambiguous Cure Dose Limitation.  A24.  In particular, the PTAB effectively required the following features be read into the Cure Dose Limitation:  (1) the need to consider $R^2$ at all; (2) the need for $R^2$ to have a value above an unspecified minimum; (3) the need to exclude the 0,0 point for purposes of calculating $R^2$, despite the fact that it is the starting point for any dose-modulus curve; and (4) the need to calculate $R^2$ from only experimentally derived data points.  A23-A24.

In fact, these new $R^2$ features are nowhere in the claims or specification of the '103 Patent. Reading $R^2$ requirements into the Cure Dose Limitation amounts to improperly narrowing the claims in violation of the BRI standard. *See, e.g., Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977-78 (Fed. Cir. 2014) (PTAB appropriately rejected examiner's narrow claim interpretation which was contrary to intrinsic evidence and added "limitations that lack support in any form of intrinsic evidence"); *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1352-53 (Fed. Cir. 2013) (PTAB "erred by narrowing the definition of 'storage stable' to something far short of its broadest reasonable meaning"); *Cisco Sys., Inc. v. Lee*, 557 Fed. Appx. 963, 974-75 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 377 (2014) (PTAB improperly narrowed the claim term by reading in an "improper limitation of the claimed multiplexer"); *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1375 (Fed. Cir. 2012) ("it is not proper to import . . . limitations that are not found in the claims themselves").

Yet, according to the PTAB, because Corning has "failed to prove that prior art compositions inherently attain 95% of the maximum attainable modulus at a cure dose of less than 0.65 J/cm$^2$" (A8), construction of the Cure Dose Limitation is not necessary. That ruling turns the analysis upside down. Not only has the PTAB improperly read limitations that are not disclosed anywhere in the '103 Patent (*i.e.*, the need to determine $R^2$ at all) into the Cure Dose Limitation, the

PTAB did so while stating that there is no need to construe this "dispositive" claim limitation.  *See* A8; A32.

If a particular $R^2$ value is not needed, then both Corning's testing under the procedure in the '103 Patent specification and Corning's raw data clearly show that Examples 10-1 and 10-2 meet the Cure Dose Limitation.  On the other hand, if a particular $R^2$ value is needed, then the PTAB must construe the Cure Dose Limitation in a manner that addresses why and how the $R^2$ features should be imported into the claims, what particular $R^2$ value must be achieved in order to meet the Cure Dose Limitation in the claim, and how $R^2$ values are to be determined.  Without specifics about how to calculate $R^2$ and a minimum $R^2$ necessary to meet (or avoid) the claim limitation, there is no way to determine whether the claim is disclosed by the prior art or infringed by products in commerce.

The PTAB's holding that Corning had not demonstrated that the prior art met the Cure Dose Limitation, was based on DSM's argument that Corning's analysis was "statistically invalid."  A13.  This is confirmed by the PTAB's review of DSM's arguments about the failure of Corning's curve fitting to achieve a "high enough" $R^2$.  *See, e.g.*, A15 (block quoting DSM's expert's discussion of $R^2$); A18 (detailing DSM's expert's alleged "suspicions" about Corning's $R^2$ values, and DSM's expert's recalculation of Corning's $R^2$ values by omitting the origin); A19

(reproducing DSM's charts of its analysis of the $R^2$ of Corning's data and DSM's expert's speculation about why Corning's data "was subject to some type of systematic or experimental error"); A21 (discussing the parties' positions on whether to use the 0,0 point as part of the calculation of $R^2$); A24 (detailing its determination that the 0,0 point should not be considered in determining $R^2$, stating that "[f]itting data points to a curve is important").

In an apparent attempt to insulate its ruling from a proper *de novo* review of its claim construction, in its Decision on Rehearing, the PTAB argues that "$R^2$ values were not incorporated into the claims. Rather . . . our evaluation of $R^2$ values formed part of our analysis crediting Bowman over Corning's witnesses." A32-A33. In fact, the PTAB's evaluation of $R^2$ values was the *only* basis on which the PTAB credited Dr. Bowman over Dr. Reichmanis. A23-A25. While the PTAB may be unwilling to acknowledge that it effectively incorporated an (undisclosed) $R^2$ value into the Cure Dose Limitation, the reasoning set forth in the Final Decision cannot be separated from this fact, particularly where the PTAB failed to articulate its claim construction. The Final Decision credits Dr. Bowman's unsupported claim that Corning miscalculated its $R^2$ value, and there is no explanation *why* $R^2$ has any bearing on the Cure Dose Limitation as claimed, or *how* it might affect the Cure Dose Limitation.

## C.    Conclusion

Reading $R^2$ requirements into the Cure Dose Limitation, let alone some unidentified $R^2$ threshold value, was not the BRI of that limitation. Accordingly, the PTAB's claim construction should be reversed.

## III.    THE PTAB'S DETERMINATION THAT EXAMPLES 10-1 AND 10-2 DO NOT TEACH THE CURE DOSE LIMITATION IS CONTRIVED AND BASED ON FLAWED ANALYSES

The PTAB's finding that Corning did *not* establish by a preponderance of evidence that Examples 10-1 and 10-2 inherently describe inner primary coatings meeting the Cure Dose Limitation is based on flawed analyses. The PTAB's Final Decision improperly imports an undisclosed $R^2$ limitation into the claims, and thereby conflates the Cure Dose Limitation with whether or not Corning's data had a satisfactory (but undisclosed) $R^2$ value.

The PTAB's incorporation of an $R^2$ analysis and an unknown $R^2$ value limitation into the claims that is not there is a consequence of the PTAB having made critical analytical errors. These include: (i) misapprehending the cure dose evidence and giving undue credit to Dr. Bowman's speculative assessment of Corning's cure dose statistics; (ii) failing to acknowledge that Corning's data alone, with or without any curve fitting or $R^2$ analysis, shows that the prior art meets the Cure Dose Limitation; and (iii) basing its decision on DSM data that the PTAB itself determined was unreliable. Had the PTAB avoided these critical

analytical errors, it would not have improperly imported limitations into the claims that are not otherwise there, and it would have found in favor of Corning.  The PTAB's analytical errors mean that this Court should not afford the PTAB's Final Decision deference under the "substantial evidence" standard and should rule in Corning's favor.

### A. Corning's Testing of Examples 10-1 and 10-2 Followed the '103 Patent for Determining Cure Dose and Demonstrated that Examples 10-1 and 10-2 Meet the Cure Dose Limitation

The PTAB states that "Corning has failed to establish that the properties of [Szum '157's Examples 10-1 and 10-2] fall within the scope of the claims."  A25. Yet, nowhere in the Final Decision does the PTAB acknowledge that Corning followed the procedure set forth in the '103 Patent (unlike DSM), to the extent any such procedures were specified, when conducting its cure dose tests on Examples 10-1 and 10-2.  *See* A33 ("assuming, arguendo" that Corning conducted its testing correctly).

While the claims have no details of how to determine cure dose, the specification describes a test.  A43, 9:21-44.  Corning followed this procedure. A1282-A1283 ¶¶29-31; A1200-A1201 ¶¶68-70; A1432-A1433 ¶34.  The '103 Patent claims require nothing more and, indeed, permit much less.  By following this test, Corning determined that Examples 10-1 and 10-2 of Szum '157 meet the Cure Dose Limitation in the claims of the '103 Patent by being less than 0.65

$J/cm^2$.  A137; A1434 ¶37.  As a result, Szum '157, with or without the other cited

references, renders the '103 Patent claims unpatentable.  A134; A137.

Regarding the curve fitting Corning performed, even Dr. Bowman

acknowledged that Corning used a proper exponential equation to fit a curve to its

data.  *See* A1870, 1142:7-1143:11.  This exponential equation, by nature, will

extend from the 0,0 point into a rapid rise portion and then to a plateau region.  *See*

A1859, 1098:3-21; *see also* A1453-A1454 ¶¶72-73; A1457 ¶81.

When plotting data for fast-curing compositions in which the composition

has been almost fully cured at the lowest experimental dose of $0.2\ J/cm^2$, all the

data points will appear on the part of the curve that flattens out in the plateau

region.  A1453-A1454 ¶73.  This is what can be seen in Corning's dose-modulus

curves.  *See* A1453-A1454 ¶73.  Any fast-curing coating, when tested pursuant to

the '103 Patent's procedure, will only have experimental data points in the plateau

region.  A1453-A1455 ¶¶72-75; A1457 ¶81.  Having carried out, to the extent

possible, the cure dose test as set forth in the specification, the PTAB improperly

faulted Corning's methodology and the results it achieved.

Disqualifying a prior art reference because it is a fast-curing composition—

and will consequently have a lower $R^2$ value when based only on experimentally

derived data points—illogically disqualifies the prior art reference based on the

very property on which the '103 Patent purports to distinguish itself from the prior art.  A39, 2:28-32; A43, 9:23-25; A1453-A1455 ¶¶72-75; A1457 ¶81; A1459 ¶85.

The PTAB's Decision on Rehearing further sets forth its contrived findings in this case as follows:

> Assuming *arguendo* that Corning followed the procedure set out in the '103 Patent, we agree with DSM that "[t]he results must still be scientifically valid."  IPR 43, Paper 102, 13 (A929).  In this respect, we found that the results were not scientifically valid based essentially on the credible testimony of Dr. Bowman.

A33.  Dr. Bowman's testimony on this point relied exclusively on the alleged importance of $R^2$.  Yet, as discussed, *infra* at Point III.C., there is nothing in the '103 Patent or elsewhere in the record indicating that calculation of an $R^2$ value must be performed at all, must be performed a certain way, or that the results must exceed some (undisclosed) threshold.  If this were true, then surely the '103 Patent would speak to it.  It does not.

### B.    Corning's Data Alone, Without any Curve Fitting, Shows that Prior Art Example 10-2 Meets the Cure Dose Limitation

The PTAB states that

> [o]nce the data points are curve-fitted, the "maximum" modulus surfaces at the point where the curve flattens out.  *See*, *e.g.*, Ex. 2030, Fig. 1 (essentially between a dose of 1.00 and 2.00 J/cm$^2$) … [and] [o]nce one skilled in the art has a properly fitted curve, determination of 95% of the maximum modulus is possible.

A24. Yet, using this analytical technique, Corning's data alone, without any curve fitting or $R^2$ analysis, shows that at least Example 10-2 meets the Cure Dose Limitation.

Specifically, the moduli values Corning determined for Example 10-2 are in Table A as follows:

Table A

| Dose (J/cm$^2$) | Corning, Ex. 10-2 |
|---|---|
| 0.2 | $0.61 \pm 0.05$ |
| 0.3 | $0.63 \pm 0.04$ |
| 0.5 | $0.66 \pm 0.08$ |
| 0.75 | $0.62 \pm 0.06$ |
| 1.0 | $0.67 \pm 0.06$ |
| 2.0 | $0.65 \pm 0.06$ |

A1451 ¶68. Using the analytical technique employed by the PTAB, the maximum attainable modulus for prior art Example 10-2 is the value between 0.67 MPa (at a dose of 1.0 J/cm$^2$) and 0.65 MPa (at a dose of 2.0 J/cm$^2$). A24. The modulus between 0.67 MPa and 0.65 MPa is 0.66 MPa.

Ninety-five percent of 0.66 is 0.63. This means that the 95% maximum attainable modulus of Example 10-2, according to the Corning data, is 0.63 MPa. The individual data points in Table A, *supra*, show that the moduli values at 0.3 J/cm$^2$ and 0.5 J/cm$^2$ are at or higher than 0.63 MPa. The modulus at 0.3 J/cm$^2$ is 0.63 and the modulus at 0.5 J/cm$^2$ is 0.66. The individual data points thus show

definitive cure doses at which 95% of maximum attainable modulus has been reached without even having to analyze the curve.

In particular, Corning's data points for Example 10-2 show that the maximum attainable modulus has already been reached at the cure dose levels of 0.3 J/cm$^2$ and 0.5 J/cm$^2$, both of which fall within the less than 0.65 J/cm$^2$ claim value. Therefore, regardless of how the curve is fit to the data points or what the R$^2$ value of the curve is, the individual data points demonstrate that at 0.3 J/cm$^2$, 95% of the maximum attainable modulus has at least been reached, and that by 0.5 J/cm$^2$, 95% of the maximum attainable modulus for Example 10-2 has been exceeded.

Even if no curve-fitting analysis is performed (and none is required by the '103 Patent claims), the individual data points demonstrate that 95% of the maximum attainable modulus has been reached at cure dose values within the claimed range of "less than 0.65 J/cm$^2$."[7]

> The PTAB dismisses this argument, as follows:
>
> Corning's argument relies on Ms. Kouzmina's testing and testimony and Dr. Winningham's testimony. In entering a Final Written Decision, we did not credit that testing and testimony. Instead, we credited the testimony of DSM's witness Dr. Bowman. Nothing in the Request for Rehearing convinces us that we should reevaluate our credibility assessment.

---

[7] Similarly, Corning properly determined that the cure dose value of Example 10-1, 0.37 J/cm$^2$, fell within the claimed range. *See* A137.

45

A33.  Actually, the PTAB misstates its own credibility assessment set forth in its Final Decision: "[T]o the extent there is a conflict between the two witnesses with respect to Corning's *cure dose proofs*, we credit Bowman over Reichmanis."  A23. The PTAB's Final Decision does not discredit Ms. Kouzmina's testing and testimony or Dr. Winningham's testimony.  *See* A23.  The PTAB acknowledges that "[i]n reaching our decision that Corning has failed to establish inherency as to the '95% limitation,' we have assumed that both Corning and DSM accurately reproduced [Examples 10-1 and 10-2]."  A23.

### C.    The PTAB Improperly Credited Dr. Bowman's Erroneous and Irrelevant $R^2$ Assessment of Corning's Cure Dose Statistics By Making Its Own Determinations of What Is Scientifically Valid

The PTAB determined that Corning failed to establish inherency of the Cure Dose Limitation in Examples 10-1 and 10-2 based on an alleged flaw in "Corning's cure dose proofs."  A23.  That alleged flaw is a statistical measure of Corning's dose-modulus curve, namely the $R^2$ calculation.  The $R^2$ calculation is nowhere mentioned in the '103 Patent claims, and is nowhere referred to in the '103 Patent specification.  All that the '103 Patent specification requires is "fitting a curve through the data points."  A43, 9:42.  There is no mention at all of calculating $R^2$ values or any other statistical analysis.

The PTAB credited Dr. Bowman's testimony, thus adopting DSM's argument that Corning's testing should be rejected based on an alleged flaw in the

$R^2$ values of its dose-modulus curves. A23. However, the PTAB misapprehended the evidence of record in adopting $R^2$ as a relevant issue and in crediting Dr. Bowman to arrive at its own contrived notion of what is a scientifically valid determination of Corning's data.

### 1.    Dr. Bowman's Opinions on $R^2$ Are Not Based on the '103 Patent or any Facts, and Thus Are Mere Conjecture

The PTAB's flawed analysis is clearly evident in its characterization of Dr. Bowman's testimony related to Corning's cure dose proofs as being "detailed and supported by underlying data." A23. Such a characterization is entirely unwarranted. In contrast, the PTAB characterized Dr. Reichmanis' testimony on this same issue as being "general and . . . not credibly supported by underlying data." A23-A25. The PTAB's reliance on Dr. Bowman's speculative testimony is improper. Regarding the $R^2$ limitation that the PTAB reads into the claims, there is no evidence other than Dr. Bowman's bald assertion, unsupported by data, that $R^2$, despite not being mentioned in the '103 Patent, has any relevance. Given that flawed analysis, to the extent this Court reviews the PTAB analysis of the facts, that analysis is not entitled to deference under the "substantial evidence" standard.

### a.    Dr. Bowman Argues that Corning's $R^2$ Values Are Too Low and, Therefore, Flawed, But Fails to Explain Why or How This Effects the Cure Dose Limitation

Dr. Bowman characterizes Corning's dose-modulus curves of Examples 10-1 and 10-2 as being "suspicious." A3716-A3717 ¶122. Based on this *suspicion*,

Dr. Bowman asked DSM to recalculate Corning's $R^2$ values for the dose-modulus curves of Examples 10-1 and 10-2. *See* A3717-A3718 ¶124. Dr. Bowman failed to disclose who performed these recalculations, and he provided no information in his declaration about *how* those recalculations were performed; nor did he provide the underlying data or calculations that DSM used to generate the new $R^2$ values. A3717-A3719 ¶¶124-125.

Instead, Dr. Bowman reported the results in conclusory fashion. *See* A3718-A3719 ¶125. The PTAB ignored this lack of transparency in *how* DSM recalculated $R^2$ values for Corning's test data in characterizing Dr. Bowman's cure dose proofs as "detailed and supported by underlying data." A23. In addition, DSM did not present testimony from the employees who performed these calculations, shielding them from cross-examination, thus preventing Corning from testing the underlying facts in discovery.[8] *See* A702; A712-A713.

Moreover, DSM failed to provide any rationale as to *why* the $R^2$ calculation has any bearing on the Cure Dose Limitation, or *what* such recalculation proves. Dr. Bowman generically states that:

---

[8] Corning sought in discovery (i) the underlying data and calculations DSM used to recalculate Corning's $R^2$ value, and (ii) testimony from DSM scientists who performed those calculations. Corning pursued both issues in a motion to compel (A506-A508), which DSM opposed (A513-A515), and the PTAB denied (A521-A525). Corning also moved to exclude Dr. Bowman's testimony on these points. A713. Although the PTAB correctly excluded DSM's documents, it improperly allowed Dr. Bowman's testimony (A870-A871), though the PTAB did not specifically address Dr. Bowman's opinion regarding $R^2$.

> Upon seeing such low $R^2$ values [as recalculated by DSM], a person of ordinary skill in the art would have immediately recognized that either (i) Corning's data was subject to some type of systematic or experimental error (*e.g.*, the use of a malfunctioning or uncalibrated radiometer) or (ii) it needed to collect additional data points to show that the system being tested actually exhibits the expected exponential increase in modulus at doses lower than 0.2 J/cm$^2$. Corning did not collect additional data points at doses lower than 0.2 J/cm$^2$. Accordingly, Corning's data set cannot eliminate systematic and experimental errors as an explanation as to why its data does not conform to the modulus-dose behavior predicted by Equation 1 and as typically observed. [] (Ex. 2058 [A3991-A3999]).

A3719-A3720 ¶126. This is nothing more than bald speculation, which is entitled to little weight. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed. Cir. 1985) (lack of factual support for expert opinion "may render the testimony of little probative value in a validity determination").

Dr. Bowman cites to *no* authority supporting his conclusion that Corning's curve fitting analysis (which included the origin, at 0,0, as all dose-modulus curves do) is statistically invalid. *See* A3719-A3720 ¶126. He cannot demonstrate that Corning's curve fitting analysis is inconsistent with what is taught in the '103 Patent, because the '103 Patent *does not* address the topic. Instead, Dr. Bowman speculates that DSM's recalculation of $R^2$ indicates a *potential* problem "that *may have caused* the invalidity of Corning's data." A3720-A3721 ¶127. In additional unsupported speculation, Dr. Bowman guessed that the alleged issue might be the result of a radiometer calibration issue. A3719-A3720 ¶126. Dr. Bowman based that speculation on his belief that Corning had a calibration issue with a *different*

49

test for a *different* property in a *different* IPR.  *See* A3720-A3721 ¶127.  Yet, Dr. Bowman identified no actual "systematic [or] experimental errors" in this case.

DSM tested coatings thicker than that identified in the '103 Patent specification.  A1440-A1441 ¶49.  This was identified as a critical mistake undermining DSM's data (*see* A1436-A1441 ¶¶42-50), a fact confirmed by the PTAB.  *See* A26-A27.  Dr. Bowman apparently did not catch *that* issue (A1778, 865:23-866:4), and the PTAB does not explain why DSM's attempt to skew the cure dose test (A1432-A1433 ¶34) does not terminally infect the entirety of DSM's position on cure dose testing.

Dr. Bowman also suggests that Corning should have measured doses below 0.2 J/cm$^2$.  A3719 ¶126 .  That argument is baseless since, as discussed *supra*, Corning followed the cure dose test described in the '103 Patent specification, which specifically instructs which data points to collect.  *See* A1457 ¶81 (the '103 Patent "instructs which cure doses (J/cm$^2$) to measure (*i.e.*, 0.2, 0.3, 0.5, 0.75, 1.0, and 2.0 J/cm$^2$)").  A43, 9:30-32.  Finally, as discussed *infra* at Point III.C.1.b., contrary to Dr. Bowman's speculation, the dose-modulus behavior observed in Corning's testing of Examples 10-1 and 10-2 is exactly what is typically observed in other fast-curing coatings.  A1453 ¶72.

In contrast to the unsupported and speculative nature of Dr. Bowman's testimony on the R$^2$ limitation imported into the claims by the PTAB, Dr.

Reichmanis (in addition to finding that DSM's experimentation used coatings that were too thick) uncovered Dr. Bowman's hidden attempt to confuse or conflate the $R^2$ value with the Cure Dose Limitation. *See* A1432-A1433 ¶34. Specifically, Dr. Reichmanis independently assessed *how* DSM had recalculated Corning's $R^2$ values of Examples 10-1 and 10-2 to lower the $R^2$ values. *See* A1458 ¶83. Dr. Reichmanis determined that DSM excluded the origin (0,0 data point) from its $R^2$ calculation of Corning's data. *See* A1458 ¶83.

Additionally, Dr. Reichmanis provided a detailed explanation of why DSM's $R^2$ recalculations were meaningless and have no bearing on the cure dose values of Examples 10-1 and 10-2. *See* A1458-A1459 ¶¶83-84. Specifically, Dr. Reichmanis stated:

> I do not believe it makes any statistical sense to exclude the origin (data point 0,0) from the data. The 0,0 data point has to be present even though there is no actual data at a 0 J/cm$^2$ dose, because a skilled scientist would recognize that the modulus will be 0 (or close to 0) at a dose of 0 J/cm$^2$ (*i.e.*, in the absence of any photopolymerizing radiation). Dr. Bowman has acknowledged this in his deposition.

A1458-A1459 ¶84.

Of course, if the $R^2$ calculation had any bearing on the cure dose property, or if it were important to calculate an $R^2$ value in a certain way, or to achieve a certain threshold (*i.e.*, an $R^2$ at or above a certain level as Dr. Bowman and the PTAB suggest), then it should have been set forth in the Cure Dose Limitation or at least discussed in the specification of the '103 Patent. But it is not. There is no

requirement in the '103 Patent to consider $R^2$ at all, let alone to achieve a certain $R^2$ value. Nor is there any discussion of how to calculate $R^2$, whether one should include or exclude the origin (0,0 data point), or which formula to use to calculate $R^2$.

Dr. Bowman and DSM provide no explanation as to why their particular method of calculating an $R^2$ value is the only (or more) correct way to determine the Cure Dose Limitation, or that $R^2$ values must be at or above a certain (undisclosed) threshold level to determine the Cure Dose Limitation. *See* A3716-A3721 ¶¶122-128. Instead, Dr. Bowman generically states:

> $R^2$ generally falls within a range of 0 to 1. An $R^2$ value close to 1 indicates a strong correlation between the fitted curve and the observed data, which means that the fitted curve accurately reflects the behavior of the observed data. When $R^2$ is closer to 1, the fitted curve can be used to accurately predict the behavior of a system. In contrast, an $R^2$ value close to 0 indicates very little correlation between the fitted curve and the observed data, which means that the fitted curve does not accurately reflect the behavior of the observed data. When $R^2$ is closer to 0, the fitted curve cannot be used to accurately predict the behavior of a system.

A3716-A3717 ¶122. Absent from this or any other statement from Dr. Bowman is how to calculate $R^2$, whether or not a particular calculation of $R^2$ is more or less meaningful than another, or how close to 1 the $R^2$ calculation should be in the type

of system taught in the '103 Patent to "accurately reflect the behavior of the observed data."  A3717 ¶122.[9]

> **b.**    **Dr. Bowman's Criticisms of Corning's "Relatively Constant" Data Lack Merit, Because All Fast-Curing Films Have Such "Relatively Constant" Data**

The reason Dr. Bowman believes Corning's reported $R^2$ values are too high, is that "Corning's cure dose data plainly looks relatively constant."  A3717 ¶123. But that is the *expected* behavior for fast-curing films, which the '103 Patent seeks to produce.  Dr. Reichmanis explained that:

> the reason Corning's data points are formed along the top of the curve [and thus are relatively constant] is due to the nature of the fast-curing coating compositions.  In other words, coatings that cure very quickly will have high modulus values at even low cure doses.

A1457 ¶81.  Having cure dose experimental data points that "look[] relatively constant" (A3717 ¶123) is the *expected result of a fast-curing composition.  See* A1453-A1454 ¶¶72-73.  The figure depicting Corning's dose-modulus curve for Example 10-2 (shown, *supra* at 21), demonstrates that fast-curing compositions can be almost fully cured at the lowest dose instructed to be tested in the '103 Patent.

---

[9] DSM's recalculation of Corning's $R^2$ value for Example 10-1, is *closer* to 1 than it is to 0.  *See* A3718 ¶125 (DSM's recalculation of Corning's $R^2$ for Example 10-1 is 0.5728).  Accordingly, even using Dr. Bowman's logic—that where an $R^2$ value is "closer to 1, the fitted curve can be used to accurately predict the behavior of a system" (A3717 ¶122)—adopted by the PTAB, Corning's testing of Example 10-1 demonstrated that it met the Cure Dose Limitation as it is "closer to 1."  The PTAB ignored this discrepancy in its limited analysis in the Final Decision.

This plot shows that Example 10-2 was almost fully cured at the initial dose of 0.2 J/cm$^2$, when compared to the values determined at the higher cure doses of 1.0 J/cm$^2$ (0.67 ± 0.06) and 2.0 J/cm$^2$ (0.65 ± 0.06).  *See* A1451 ¶68.  There is little difference in modulus values of Example 10-2 between the lowest and highest experimentally applied doses, which stayed relatively constant.

When plotting modulus data for a fast-curing composition, in which the composition has been almost fully cured at the lowest dose, all the data points appear on the part of the curve that flattens out (*i.e.*, the "plateau," following the "rapid rise" in the curve).  *See* A1453-A1454 ¶73; A1457 ¶81; A1859, 1098:12-21.

This same curve shape and "relatively constant" data points are also found in literature *published by DSM*, for dose-modulus curves of *other DSM coatings* with similar fast-curing properties.  *See* A1454-A1456 ¶¶74-79.  For example, the following dose-modulus curve in the Chawla reference, which is for a DSM-owned and developed coating, looks nearly identical, as it has all of the experimental data points in the plateau region as a result of being almost fully cured at the lowest experimental dose applied (also 0.2 J/cm$^2$).  *See* A1456 ¶79.



Figure 6. (A2192).  The Chawla curve shows *all* of the moduli data points

appearing in the plateau portion of the curve and are "relatively constant"—making

the Chawla dose-modulus curve virtually indistinguishable from the Corning

curves.[10]  *See* A1454-A1456 ¶¶74-79 (which includes *four other* modulus versus

---

[10] Dr. Reichmanis noted that the $R^2$ for the Chawla curve is 0.994 when the origin
is included and 0.163 when the origin is excluded, further demonstrating the flaw
in DSM's current position regarding the importance of $R^2$ to fast-curing films.
A1459 ¶85.  If Chawla's $R^2$ of 0.163 without the 0,0 point is good enough for
DSM to publish, there is no reason for not accepting Corning's $R^2$ of 0.5728 for
Example 10-1 and 0.4656 for Example 10-2, (A3718 ¶125) when the origin is
excluded.

Further demonstrating the baseless nature of incorporating an $R^2$ requirement at all,
however, neither the Chawla curve nor the remainder of the reference report *any* $R^2$
or other statistical analysis for the goodness of its curve fit to the data.  A2187-
A2193.

dose curves *published by DSM* for *four other DSM* optical fiber fast-curing coatings having a cure dose property within the '103 Patent's claimed range, and having the same shape as the Corning-generated dose-modulus curves, including A2167, A2181, A2185, and A2192). The PTAB ignored the evidence regarding these other fast-curing coatings, which demonstrate what the dose-modulus curve of a fast-curing coating should look like. A fast-curing coating *should* have all of the experimental data points in the plateau region as a result of the coating being almost fully cured at the lowest experimental dose. This is precisely what Corning's curves for Examples 10-1 and 10-2 showed.

With these fast-curing compositions, the experimentally derived data looks relatively constant both in the raw data and the dose-modulus curve. *See* A1867, 1128:4-1131:24. This does not mean, however, that the data is erroneous—only that Examples 10-1 and 10-2 (like Chawla and the other DSM-owned coatings) achieve the desired objective of being fast-curing compositions. As Dr. Reichmanis explained,

> what matters is what dose is required to attain 95% of the maximum attainable modulus and not how well the curve fits to the data . . . . What I view in terms of Corning's data and their modulus vs. dose curves are entirely consistent with what I would expect for coatings that have a cure dose to attain 95% of the maximum attainable modulus of 0.37 J/cm$^2$ and 0.22 J/cm$^2$, respectively.

A1459 ¶85.

In contrast to Dr. Bowman's bare "suspicion," Dr. Reichmanis provided documentary evidence supporting her conclusion, including *DSM-generated* dose-modulus curves that DSM chose to publish for *other DSM coatings* that have cure dose values at or near the cure dose values Corning determined for Examples 10-1 and 10-2, and have the same curve shape as the Corning dose-modulus curves in this case. A1453-A1456 ¶¶72-81. Based on this evidence, Dr. Reichmanis concluded that there is "nothing peculiar or suspicious" about Corning's dose-modulus curve for Examples 10-1 and 10-2. A1457 ¶80.

### D.    The PTAB Established Its Own Erroneous Notion of the Cure Dose Limitation, Which it Imports Into the Claims

The PTAB independently assigned importance to the $R^2$ calculation that the record cannot support. This demonstrates a further flaw in the PTAB's analysis. *See In re Huai-Hang Kao*, 639 F.3d at 1067 (PTAB's reliance on its own conjecture, not supported by the record, was improper). Specifically, without citing to any support in the record, the PTAB states:

> Fitting data points to a curve is important.
>
> The data points, when properly fitted to a curve, permit one skilled in the art to determine whether 95% of the maximum attainable modulus is attainable at the relevant cure dose for a given composition.

A24. There is no explanation by the PTAB what these concepts even mean. Moreover, these concepts are unsupported in the record and are inconsistent with what is taught in the '103 Patent.

For example, the '103 Patent teaches that a "dose-modulus curve [is] created by *plotting the modulus values vs. the dose and by* <u>*fitting a curve through the data points*</u>." A43, 9:40-42. In the cure dose test description from the '103 Patent, modulus measurements are *first plotted, and then a curve is fitted to those data points*. A43, 9:40-42. The PTAB seems to suggest the *opposite*—that *data points should be fitted to a curve*. Yet, nothing in the record indicates that this is proper, demonstrating that the PTAB disregarded the record and based its Final Decision on its own erroneous notions of the Cure Dose Limitation. *See In re Huai-Hang*, 639 F.3d at 1067.

Furthermore, the PTAB makes the following statements:

The '103 patent and the '508 patent do not indicate that the data points are to include the origin (0,0 data point).

Reichmanis provides no credible explanation as to why the origin should be included in the face of the explicit disclosure of the '103 patent and the '508 patent.

A24. These statements further demonstrate the PTAB's flawed analysis in this case.

First, while the PTAB points out that the '103 Patent does not indicate that the data points of a dose-modulus curve are to *include* the origin (0,0 data point), the PTAB fails to acknowledge that the '103 Patent also does not *exclude* the origin (0,0 data point). *See* A43, 9:21-44. Even Dr. Bowman acknowledged that at a dose of zero, the modulus is "close to zero." A1859, 1097:22-25. Given the

exponential equation used, the dose-modulus curve *must* go through the 0,0 point. *See* A1458-A1459 ¶84; A1859, 1097:8-21. Indeed, even DSM drew its dose-modulus curves (both in this case and in the other examples of DSM dose-modulus curves detailed in Dr. Reichmanis' declaration) originating at the 0,0 point. *See* A1453-A1459 ¶¶72-85. There is a reason why *every* dose-modulus curve of record passes through the origin, and to ignore this fact is clearly improper.

Second, the PTAB's unsupported conclusion that "Reichmanis provides no credible explanation as to why the origin should be included in the face of the explicit disclosure of the '103 patent" (A24) is not supported by the record. Dr. Reichmanis stated that "it makes [no] statistical sense to exclude the origin (data point 0,0) from the data" because "[t]he data point has to be present even though there is no actual data at a 0 J/cm$^2$ dose" given that "the modulus will be 0 (or close to 0) at a dose of 0 J/cm$^2$," a point Dr. Bowman acknowledged. A1458-A1459 ¶84.

In any event, the PTAB's statements do nothing to shed light on why the PTAB focused on the $R^2$ calculation or how the manner in which this metric is calculated effects the determination of the Cure Dose Limitation. The critical flaw in the PTAB's analysis is that it reads into the claims a requirement that the Cure Dose Limitation must be determined by calculating an $R^2$ value in a certain way—without disclosing how or why—which has no support in the '103 Patent.

In giving credence to Dr. Bowman's mere "suspicions" of Corning's $R^2$ statistical values, and rejecting as unsupported Dr. Reichmanis' detailed and thorough rebuttal regarding the applicability of $R^2$, the PTAB committed fatal analytical errors, rendering the PTAB's findings unsupported by substantial evidence.

### E.    The PTAB's Flawed Analysis Also Includes Relying on DSM Data that It Previously Discredited

DSM performed its own cure dose tests on Examples 10-1 and 10-2 (A3704-A3712 ¶¶114-117) to show that Corning's test results for these examples were incorrect.  However, DSM did not perform its tests according to the '103 Patent specification (A1437 ¶43; A27).  Instead, DSM prepared samples that were much thicker than the "approximately 75 microns" (A43, 9:27-29) thickness called for in the '103 Patent.  *See* A1439 ¶46; A26.  Dr. Reichmanis explained that the thickness of DSM's Examples 10-1 and 10-2 samples caused them to cure more slowly than Corning's samples, thus causing DSM to achieve different Cure Dose Limitation values than Corning, and to have DSM's dose-modulus curves be a different shape than Corning's.  *See* A1453 ¶72.  That different shape is exemplified in DSM's dose-modulus curve for Example 10-1, reproduced below:



**Figure 1 (A3708)**

The PTAB discredited DSM's experimental work for substantially the reasons noted by Dr. Reichmanis. The PTAB agreed that "logic would predict that thicker films would be cured to a lesser extent, at a given dose, than thinner films." A25-A26. Further, the PTAB determined that Dr. Reichmanis "makes out a plausible factual basis for finding that cure dose may be a function of thickness, and Bowman has not provided a credible, scientifically based rationale to overcome Reichmanis' plausible basis." A27.

Yet, in its reasons for crediting Dr. Bowman over Dr. Reichmanis, the PTAB inexplicably relies on the *DSM data* it previously deemed unreliable. The Final Decision states:

61

As seen visually in <u>*Figure 1*</u>, the maximum appears to be at a modulus of about 0.95 MPa.

*As shown in Figure 1*, the cure dose required to obtain 95% of the maximum attainable modulus was determined to be from 0.72 to 0.76 J/cm$^2$—a value outside the limits of claim 1 of the '103 patent.

A24-A25. The "Figure 1" reproduced above and to which the PTAB refers in the Final Decision (A24-A25), is *DSM's* cure dose data for prior art Example 10-1. Thus, the PTAB relies on the discredited DSM cure dose data (*i.e.*, data that was generated with thicker than 75-micron films) to establish that the prior art does not meet the Cure Dose Limitation.

In its Decision on Rehearing, the PTAB attempts to distance itself from its own above conclusions by stating that "Corning's failure to prove its case was in no way dependent on any faulty testing done by DSM." A34. Yet, the PTAB's reliance on DSM's Figure 1 is clearly set forth in the Final Decision as a basis upon which the PTAB determined that "Corning has failed to establish that the properties of the compositions of Examples 10-1 and 10-2 of Szum '157 fall within the scope of the claims of either patent." A25.

The PTAB recognized that DSM did not use a coating having a thickness of 75 microns, as described in the cure dose test procedures of the '103 Patent, and discredited DSM's experimental results accordingly. A26-A27. Having reached that correct conclusion, the PTAB cannot then logically rely on that very same data (*e.g.*, Figure 1, (A3708)) to support its conclusion that Examples 10-1 and 10-2 fall

outside the Cure Dose Limitation.  These positions are irreconcilable and clearly demonstrate a further flaw in the PTAB's analysis.

In creating a dose-modulus curve for Corning's experimental results, DSM did not plot the modulus value of zero at a dose of zero.  *See* A3717-A3719 ¶¶124-125; A1458 ¶83.  Since its own expert acknowledged that this modulus value must exist when curing film samples from liquid coating (A1859, 1097:22-25), DSM was wrong to exclude the (0 modulus, 0 dose) point from the dose-modulus curve.  The exclusion of that point had the effect of depriving the dose-modulus curve DSM created for Corning's experimental work of its exponential character.  This was all necessary to support DSM's argument that when DSM's version of the dose-modulus curve for Corning's experimental results was fitted to an exponential function, the goodness of fit value (*i.e.* $R^2$) was low.  On the other hand, DSM argued its own experiments were able to achieve a higher $R^2$ value even without consideration of the 0,0 point.  This was possible, because DSM used thicker coatings than specified in the '103 Patent specification.  As a result, the coatings made by DSM cured more slowly, giving the dose-modulus curve a more apparent exponential character even when the 0,0 point is excluded.  However, by failing to follow the protocol in the '103 Patent, DSM's contrived experimental results cannot save its improper statistical analysis premised on ignoring the ever-present 0,0 point.  Corning's determination that high $R^2$ values were achieved for its

experimental work when the 0,0 point was considered and the close proximity of its data points to the dose-modulus curve demonstrate that there is nothing wrong with Corning's experimental work.

## CONCLUSION

For the reasons above, the PTAB's Final Decision should be reversed or, at the least, vacated and remanded for further proceedings in light of proper claim construction.

Dated:  February 3, 2015                  Respectfully submitted,

By:   */s/Michael L. Goldman*_____

LECLAIRRYAN,
A PROFESSIONAL CORPORATION
Michael L. Goldman
Richard A. McGuirk
70 Linden Oaks, Suite 210
Rochester, New York  14625
Tel:   (585) 270-2100
Fax:  (585) 270-2179

*Attorneys for Appellant*
*Corning Incorporated*

# ADDENDUM

Final Written Decision
(A1-A29)

Decision on Rehearing
(A30-A36)

U.S. Patent No. 7,171,103
(A37-A45)

Trials@uspto.gov                                                    Paper 95
Tel:  571-272-7822                                   Entered: May 1, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

CORNING INCORPORATED
Petitioner

v.

DSM IP ASSETS B.V.
Patent Owner
_____

Case IPR2013-00043 (Patent 7,171,103 B2)
Case IPR2013-00044 (Patent 6,961,508 B2)
_____

Before FRED E. McKELVEY, GRACE KARAFFA OBERMANN,
JENNIFER S. BISK, SCOTT E. KAMHOLZ, and ZHENYU YANG,
*Administrative Patent Judges*.

McKELVEY, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73(b)*

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

I.    INTRODUCTION

    *A. Background*

Petitioner, Corning Incorporated ("Corning") filed ten petitions in November of 2012, challenging patents owned by DSM Assets B.V. ("DSM").

All ten petitions were at least partially granted, and therefore, progressed into the trial phase of an *inter partes* review.

This is the final written decision for IPR2013-00043 and IPR2013-00044, both of which raise common issues.

    1.  IPR2013-00043

The petition in IPR2013-00043 (Paper 3) challenges claims 1-18 (all of the claims) of U.S. Patent No. 7,171,103 B2 (Ex. 1001 ("the '103 patent")).

Patent Owner, DSM, filed a preliminary response on February 21, 2013.  Paper 13 ("Prelim. Resp. 43").

On May 13, 2013, the Board granted the petition as to all of the proposed grounds.  Paper 14.

The Board found that there was a reasonable likelihood that Corning would prevail with respect to the claims challenged in the petition on the following grounds:

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

| Claims Challenged | Basis | Reference(s)[1] |
|---|---|---|
| 1-15 | § 102 | Szum '157 |
| 1-15 | § 103 | Szum '157 and Szum '041 |
| 16 and 17 | § 103 | Szum '157 and Yamazaki |
| 16 and 17 | § 103 | Szum '157, Szum '041, and Yamazaki |
| 18 | § 103 | Szum '157, Yamazaki, and Winningham |
| 18 | § 103 | Szum '157, Szum '041, Yamazaki, and Winningham |

After institution of trial, DSM filed a patent owner response (Paper 43 ("PO Resp. 43")) and a supplemental response (Paper 75).

DSM also filed a motion to amend claims submitting proposed new claim 19 for claim 12.  Paper 45.

Corning filed (1) a reply to the patent owner response (Paper 64), (2) a supplemental reply (Paper 76), and (3) an opposition to DSM's motion to amend (Paper 63).

DSM then filed a reply in support of its motion to amend.  Paper 77.

    2.  IPR2013-00044

The petition in IPR2013-00044 (Paper 2) challenges claims 1-22 (all of the claims) of U.S. Patent No. 6,961,508 B2 (Ex. 1001 ("the '508 patent")).

DSM filed a preliminary response on February 21, 2013.  Paper 11.

On May 13, 2013, the Board granted the petition as to all of the proposed grounds.  Paper 12.

---

[1] The references are:  (1) WO 98/21157 (Ex. 1002) ("Szum '157" also referred to in the record as "Szum '21157"); (2) U.S. Patent No. 5,664,041 (Ex. 1003) ("Szum '041"); (3) EP 0 874 012 A1 (Ex. 1004) ("Yamazaki"); and (4) WO 01/49625 A1 (Ex. 1005) ("Winningham").

3

**A3**

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

The Board found that there was a reasonable likelihood that Corning would prevail with respect to the claims challenged in the petition on the following grounds:

| Claims Challenged | Basis | Reference(s)[2] |
|---|---|---|
| 1-8, 10-13, and 15-22 | § 103 | Szum '157 and Szum '041 |
| 9 and 14 | § 103 | Szum '157, Szum '041, and Edwards |

After institution of trial, DSM filed (1) a patent owner response (Paper 42), and (2) a supplemental response (Paper 71).

DSM also filed a motion to amend claims by submitting proposed new claim 19 for claim 12. Paper 44.

Corning filed (1) a reply to the patent owner response (Paper 60), (2) a supplemental reply (Paper 72), and (3) an opposition to DSM's motion to amend (Paper 59).

DSM then filed a reply in support of its motion to amend. Paper 73.

3. Summary

Oral argument for both cases took place on February 11, 2014. *See* IPR2013-00043, Paper 94; IPR2013-00044, Paper 91 (Transcripts of Oral Argument).

The Board has jurisdiction under 35 U.S.C. § 6(c).

This final written decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

---

[2] The references are: (1) WO 98/21157 (Ex. 1002) ("Szum '157" also referred to in the record as "Szum '21157"); (2) U.S. Patent No. 5,664,041 (Ex. 1003) ("Szum '041"); and (3) U.S. Patent No. 5,416,880 (Ex. 1004) ("Edwards").

4

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

Corning has failed to show by a preponderance of evidence that any of challenged claims 1-18 of the '103 patent and challenged claims 1-22 of the '508 patent are unpatentable.

Because we do not find any of the challenged claims unpatentable, we need not consider DSM's motions to amend claims, and therefore, the motions to amend claims in both IPR2013-00043 and IPR2013-00044 are *dismissed* as moot.

B. *Related Proceedings*

Corning and DSM are simultaneously involved in eight other *inter partes* reviews based on patents claiming similar subject matter: (1) IPR2013-00045; (2) IPR2013-00046; (3) IPR2013-00047; (4) IPR2013-00048; (5) IPR2013-00049; (6) IPR2013-00050; (7) IPR2013-00052; and (8) IPR2013-00053.

C. *The '103 Patent*

The '103 patent is titled "Coated Optical Fibers" and relates to coated optical fibers having primary and secondary coatings and to radiation-curable primary coating compositions. Ex. 1001, 1:14-16.

The patent explains that the "soft 'cushioning'" primary coating is usually in contact with the fiber, while the "relatively hard" secondary coating surrounds the primary coating. *Id.* at 1:23-26.

The coatings confer "microbending" resistance on the optical fiber, thereby helping to reduce attenuation of optical power along the fiber. *Id.* at 1:27-29.

The patent is directed, in particular, to coated optical fibers in which the primary coating provides "good microbending resistance," and

5

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

simultaneously, has a "high cure speed" that will not unduly limit production rates. *Id.* at 1:34-37.

Claims 1 and 16, reproduced below, illustrate the claimed subject matter (dispositive limitation in italics):

> 1. An inner primary coating composition having:
> (a) an in-situ modulus (after cure) of less than 0.6 MPa;
> (b) *a cure dose to attain 95% of the maximum attainable modulus of less than 0.65 J/cm²; and*
> (c) a modulus retention ratio (after cure) of at least 0.6 after hydrolytic aging; wherein said composition comprises:
>> (i) 20–98 wt. % relative to the total weight of the composition of a radiation curable urethane (meth) acrylate oligomer having polyether polyol backbone;
>> (ii) 0–80% wt. % relative to the total weight of the composition of one or more reactive diluents;
>> (iii) 0.1–20 wt. % relative to the total weight of the composition of one or more photoinitiators; and
>> (iv) 0–5 wt. % relative to the total weight of the composition of additives.
>
> 16. A coated optical fiber comprising:
> (a) an optical fiber;
> (b) a primary coating obtained by curing the coating composition according to claim 1;
> (c) a secondary coating, wherein said secondary coating has:
>> (i) a Tg of about 60° C. or higher;
> (ii) an elongation at break of at least 20%; and
> (iii) a tensile modulus of at least 500 MPa.

### D. The '508 Patent

The '508 patent is titled "Coated Optical Fibers" and relates to coated optical fibers having primary and secondary coatings and to radiation-curable, primary coating compositions. 44 Ex. 1001, 1:12-16.

6

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

The patent explains that the "soft 'cushioning'" primary coating is usually in contact with the fiber, while the "relatively hard" secondary coating surrounds the primary coating. *Id.* at 1:19-26.

The coatings confer "microbending" resistance on the optical fiber, thereby helping to reduce attenuation of optical power along the fiber. *Id.* at 1:23-26.

The patent is directed, in particular, to coated optical fibers in which the primary coating provides "good microbending resistance" and simultaneously has a "high cure speed" that will not unduly limit production rates. *Id.* at 1:30-34.

Claims 1 and 20, reproduced below, illustrate the claimed subject matter (dispositive limitations in italics):

> 1. A coated optical fiber comprising:
> (i) an optical fiber;
> (ii) a primary coating; and
> (iii) a secondary coating;
> wherein
> > (a) said coated optical fiber has an attenuation increase of less than 0.650 dB/km at 1550 nm;
> > (b) said primary coating has a modulus retention ratio after hydrolytic aging of at least 0.5 and/or a glass transition temperature (Tg) below −35° C.; and
> > (c) *said primary coating is obtained by curing a primary coating composition having a cure dose to attain 95% of the maximum attainable modulus of less than 0.65 J/cm$^2$.*
>
> 20. An inner primary coating composition having:
> (a) an in-situ modulus (after cure) of less than 0.6 MPa;
> (b) *a cure dose to attain 95% of the maximum attainable modulus of less than 0.65 J/cm$^2$;* and
> (c) a modulus retention ratio (after cure) of at least 0.6 after hydrolytic aging.

7

**A7**

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

II.    ANALYSIS

*A. Claim Construction*

As a step in our analysis for determining whether the challenged claims are unpatentable, we determine the meaning of the claims.

The Board interprets claims of an unexpired patent using the broadest reasonable construction in light of the specification of the patent. *See* 37 CFR § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).

The dispositive claim limitation in the '103 patent is limitation (b) of claim 1: "a cure dose to attain 95% of the maximum attainable modulus of less than 0.65 J/cm$^2$."

The dispositive claim limitation in the '508 patent is limitation (c) of claim 1: "said primary coating is obtained by curing a primary coating composition having a cure dose to attain 95% of the maximum attainable modulus of less than 0.65 J/cm$^2$."

Corning has failed to prove that prior art compositions inherently attain 95% of the maximum attainable modulus at a cure dose of less than 0.65 J/cm$^2$.

DSM has failed to prove that the prior art compositions do not attain 95% of the maximum attainable modulus at a cure dose of less than 0.65 J/cm$^2$.

Accordingly, there is no occasion to construe further the language of limitation (b) of claim 1 of the '103 patent or limitation (c) of the '508 patent, hereinafter the "95% limitations."

*B. Testimony and documentary evidence*

8

**A8**

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

The testimony and documentary evidence relevant to the "95% limitations" in both IPRs are essentially the same.

We discuss the testimony and evidence, citing to the evidence of record in IPR2013-00043.

Nevertheless, Table 1, reproduced below, correlates chronologically by exhibit number the common testimony and documentary evidence submitted, and upon which we have relied in deciding both IPR2013-00043 and IPR2013-00044.

| Table 1 | | |
|---|---|---|
| **Description of testimony or document** | **Ex. number in IPR2013-00043** | **Ex. number in IPR2013-00044** |
| U.S. Patent 5,416,880 "Edwards" | None | 1004 |
| '508 Patent | None | 1001 |
| '103 Patent | 1001 | None |
| WO 98/21157 "Szum '157" | 1002 | 1003 |
| U.S. Patent 5,664,041 "Szum '041" | 1003 | 1002 |
| Winningham declaration | 1006 | 1005 |
| Kouzmina declaration | 1007 | 1006 |
| Reichmanis declaration | 1028 | 1026 |
| Bowman cross-examination | 1033 | 1031 |
| Anderson | 1038 | 1036 |
| Schmid | 1047 | 1045 |
| Chawla | 1050 | 1048 |
| Kouzmina cross-examination | 2022 | 2021 |
| Kouzmina cross-examination | 2024 | 2022 |
| Winningham cross-examination | 2028 | 2027 |
| Bowman declaration | 2030 | 2029 |
| Dose-segment modulus data | 2049 | 2048 |
| Dose-segment modulus data | 2050 | 2049 |
| Dose-segment modulus data | 2051 | 2050 |
| Dose-segment modulus data | 2052 | 2051 |
| Curve fit and statistical analysis | 2053 | 2052 |
| Proc. of the Int'l Soc. for Optical Eng'g | 2058 | 2057 |

9

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

In support of its petitions, Corning offered the testimony of Ms. Inna I. Kouzmina (Ex. 1007).

According to Kouzmina, compositions were made in accordance with Example 10-1 and Example 10-2 as described by Szum '157 (Szum '157, 118:10-21; Table 15).

Kouzmina also testified (Ex. 1007 ¶ 29) concerning "[t]ests . . . conducted on primary coatings as described in Example 10-1 and Example 10-2 of Szum ['157], to measure the cure dose to attain 95% of the maximum attainable modulus of the cured coatings in accordance with procedures set forth in the '103 patent at 9:21-43."

Kouzmina explains (Ex. 1007 ¶ 30):

> Specifically, cure dose was determined by Dose vs. Modulus curve analysis. Six radiation-cured sample films of each composition were prepared, with each sample film being obtained by applying and curing, at room temperature under a nitrogen atmosphere, a composition having a thickness of approximately 75 microns on a glass plate. Each composition was cured with a different dose: 0.2, 0.3, 0.5, 0.75, 1.0, and 2.0 $J/cm^2$ respectively. Six specimens were cut from the center portion of each prepared sample film. MTS Tensile Tester of MTS Systems Corporation was used to measure the 2.5% secant modulus of each specimen. The dose-modulus curve was then created by plotting the modulus values vs. the dose and by fitting a curve through the data points. The "cure dose" of the coating composition was determined to be the dose at which 95% of the ultimate secant modulus was attained.

The experimental cure dose to attain 95% of the maximum attainable modulus is described in Kouzmina Table B (Ex. 1007 ¶ 31):

10

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

**Table B. Cure Dose to Attain 95% of the Maximum Attainable Modulus**

| Sample | Results |
|---|---|
| Szum '21157 Example 10-1 | 0.37 J/cm$^2$ |
| Szum '21157 Example 10-2 | 0.22 J/cm$^2$ |

In a light most favorable to Corning, we will assume the "modulus" mentioned in paragraph 31 and Table B is a secant modulus.

In support of its petitions, Corning also offered the testimony of Dr. Michael Winningham (Ex. 1006).

According to Winningham (*id.* ¶ 92):

> Element (b) of ['103 patent] claim 1 requires the primary coating composition to have "a cure dose to attain 95% of the maximum attainable modulus of less than 0.65 J/cm$^2$." The primary coating composition[s] of Examples 10-1 and 10-2 of Szum ['157] have a cure dose of 0.37 J/cm$^2$ and 0.22 J/cm$^2$, respectively, to attain 95% of the maximum attainable modulus. Kouzmina Decl. [Ex. 1007] ¶ 31. Thus, the limitation of element (b) of claim 1 is met by the disclosure of Szum ['157].

Kouzmina's cross-examination reveals that she oversaw, but did not personally conduct, the experimental work reported in her direct testimony.

Kouzmina testified that (1) she instructed two Corning scientists to make oligomers per information described in the prior art (presumably including Szum '157), and (2) asked them to make compositions described in the prior art and report back to her when their experimental work was done. Ex. 2022, 433:17–435:2.

In due course, the two scientists "generated results and reported back . . . those results [to Kouzmina]." *Id.* at 484:21-23.

When asked how she knew the two Corning scientists accurately made the oligomers, Kouzmina testified that "I had their notes and they

11

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

reported to me for this project, so I have their information." *Id.* at
436:20-22.

What Kouzmina means by "notes" is not clear; we will assume that
the "notes" are laboratory-like notebooks and related documents.

When asked "[w]hat level of scrutiny did you give the oligomer
synthesis," Kouzmina responded "I . . . instructed the [Corning scientists]
making oligomers to follow the . . . prior art as closely as possible. And I
trusted their judgment on executing this." Ex. 2024, 866:25–867:8.

Winningham testified that he did not "review any lab notebooks" and
"I don't recall seeing any other data." Ex. 2028, 690:18-19.

Data and other documents related to Corning's tests did not
accompany the Petition.

As a result of "additional discovery" (37 C.F.R. § 41.150(c)), DSM
obtained some laboratory notebooks and other documents. PO Resp. 43, 9.

After analysis of all the evidence available to it, DSM challenges the
accuracy of the "Results" set out in Table B. *Id.* at 20-21.[3]

In support of its response, DSM submitted the direct declaration
testimony of Dr. Christopher N. Bowman. *Id.* at 21.

---

[3]   On page 20, footnote 2, of the patent owner's response (PO Resp. 43),
DSM attempts to incorporate by reference arguments made in its preliminary
response (Prelim. Resp. 13). We decline to consider arguments incorporated
by reference. Incorporation by reference is an unacceptable means of
permitting a party to exceed page limits set out in the rules. 37 C.F.R.
§ 42.24; *see also DeSilva v. DiLeonardi*, 181 F.3d 865, 866-67 (7th Cir.
1999) ("[A]doption by reference amounts to a self-help increase in the
length of the appellate brief." "[I]ncorporation [by reference] is a pointless
imposition on the court's time. A brief must make all arguments accessible
to the judges, rather than ask them to play archaeologist with the record.").

12

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

DSM's challenge is based on two rationales: (1) its own counter-testing (*id.* at 21-25); and (2) Corning's cure dose analysis, which is said to be statistically invalid (*id.* at 26-28).

Bowman testified that he understood that DSM prepared compositions described in Examples 10-1 and 10-2 of Szum '157. Ex. 2030 ¶ 71.

Bowman further testified that DSM determined cure doses to attain 95% maximum attainable modulus of the compositions described in Examples 10-1 and 10-2 of Szum '157. *Id.* ¶¶ 113-14.

According to Bowman (Ex. 2030 ¶ 114):

> Six sample films of each of Szum '157 Examples 10-1 and 10-2 were prepared on a plate and exposed to a dose of 0.2 $J/cm^2$, 0.3 $J/cm^2$, 0.5 $J/cm^2$, 0.75 $J/cm^2$, 1.0 $J/cm^2$, and 2.0 $J/cm^2$, respectively, from a 600 W "D"-lamp under a blanket of nitrogen to ensure maximum cure at each dose. Prior to exposure of the samples, the dose was measured three times using a calibrated ILT490 broadband UVA/UVB radiometer from International Light Technologies, which is calibrated at least once every six months, to confirm proper dosage. After each sample was exposed to the relevant dose, it was conditioned at about 23±1ºC and at a relative humidity of about 50% for sixteen to twenty-four hours. The center of each sample was then cut into specimens having a width of 12.7 mm. The thickness of each specimen was measured at five different locations to confirm that each specimen exhibited uniform thickness. This data, as well as the average thickness of each specimen, is summarized in Exhibits 2049-2052.

Exhibits 2049-52 describe DSM "mean" thickness data as follows:

13

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

| Exhibit | Mean thickness | Segment or Secant Modulus |
|---------|----------------|---------------------------|
| 2049 | 0.086 | Segment |
| 2050 | 0.090 | Secant |
| 2051 | 0.095 | Segment |
| 2052 | 0.099 | Secant |

DSM's average segment and secant moduli of reproduced Examples 10-1 and 10-2 as a function of cure dose ($J/cm^2$) are reported in Table 3 of Bowman's declaration (Ex. 2030 ¶ 115).

Table 3

| Szum '157 Coating Composition | Cure Dose ($J/cm^2$) | Segment Modulus (MPa) | Secant Modulus (MPa) |
|-------------------------------|----------------------|-----------------------|----------------------|
| Example 10-1 | 0.2 | 0.52±0.02 | 0.53±0.03 |
| | 0.3 | 0.69±0.02 | 0.69±0.02 |
| | 0.5 | 0.82±0.01 | 0.82±0.01 |
| | 0.75 | 0.90±0.01 | 0.90±0.01 |
| | 1.0 | 0.90±0.02 | 0.90±0.02 |
| | 2.0 | 0.99±0.03 | 0.99±0.03 |
| Example 10-2 | 0.2 | 0.29±0.02 | 0.31±0.02 |
| | 0.3 | 0.40±0.02 | 0.41±0.02 |
| | 0.5 | 0.49±0.01 | 0.50±0.01 |
| | 0.75 | 0.53±0.02 | 0.54±0.01 |
| | 1.0 | 0.55±0.01 | 0.55±0.01 |
| | 2.0 | 0.62±0.01 | 0.62±0.01 |

Error in Table 3 is reported as one standard deviation.

Data described in Table 3 and Exhibits 2049-52 was used to plot segment and secant modulus (MPa) as a function of dose ($J/cm^2$) curves.

An example of a DSM curve of segment modulus as a function of dose for Szum '157 Example 10-1 is set out below (Ex. 2030).

14

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)



Depicted is a graph of segment modulus v. dose
for Szum '157 Example 10-1

According to Bowman (*id.* ¶ 117):

After curve-fitting, the cure dose to attain 95% of the maximum attainable segment modulus was determined to be 0.74 J/cm$^2$ with a 95% confidence interval ranging from 0.72 J/cm$^2$ to 0.76 J/cm$^2$.  $R^2$ for the fit was 0.9786 based on the average segment modulus at each dose and 0.9640 based on all data points at each dose.  (See Ex. 2053[, 2 of 11 and 11 of 11]).

Bowman explains the significance of "$R^2$" as follows (Ex. 2030

¶ 122):

In statistics, $R^2$ is known as the coefficient of determination. In a curve fitting analysis, $R^2$ is a measure of the correlation between the fitted curve and the observed data.  $R^2$ generally falls within a range of 0 to 1.  An $R^2$ value close to 1 indicates a strong correlation between the fitted curve and the observed data, which means that the fitted curve accurately reflects the behavior of the observed data.  When $R^2$ is closer to 1, the fitted curve can be used to accurately predict the behavior of a system.  In contrast, an $R^2$ value close to 0 indicates very little correlation between the fitted curve and the observed data, which means that the fitted curve does not accurately reflect the behavior of the observed data.  When $R^2$ is closer to 0, the fitted

15

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

curve cannot be used to accurately predict the behavior of a system.

A summary of DSM cure dose data for segment and secant moduli for Szum '157 appears in Table 4 of Bowman's declaration testimony (*id.* ¶ 117).

Table 4

| Measured modulus at 2.5% Strain | Szum '157 Example | Cure dose to attain 95% maximum attainable modulus $(J/cm^2)$ | Meets the "less than 0.65 $J/cm^2$" cure dose claim limitation? |
|---|---|---|---|
| Segment | 10-1 | 0.74 | No |
| Secant | 10-1 | 0.73 | No |
| Segment | 10-2 | 0.83 | No |
| Secant | 10-2 | 0.81 | No |

According to the data in Table 4, DSM did not obtain 95% of the maximum attainable modulus with a dose of less than 0.65 $J/cm^2$ in reproducing Szum '157 Examples 10-1 and 10-2. Ex. 2030 ¶ 118.

Bowman therefore found that Examples 10-1 and 10-2 cannot inherently describe subject matter within the scope of claim 1 of the '103 patent. *Id.* ¶ 119.

Bowman also addressed the statistical validity of Corning's experimental results. *Id.* ¶ 120.

Unlike DSM, Corning did not provide underlying data with its petition to support cure doses reported by Kouzmina and Winningham.

Bowman Table 5, reproduced below, compares cure dose measured by Corning and DSM for secant modulus. *Id.*

16

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

Table 5

| Szum '157 Coating Composition | $M_{95\%}$ Cure Dose as measured by Corning ($J/cm^2$) | $M_{95\%}$ Cure Dose as measured by DSM ($J/cm^2$) | Difference ($J/cm^2$) |
|---|---|---|---|
| Example 10-1 | 0.37 | 0.73 | 0.36 |
| Example 10-2 | 0.22 | 0.81 | 0.59 |

While Corning believes its cure dose falls within the scope of claim 1 of both the '103 patent and the '508 patent, the DSM cure dose does not.

Through additional discovery, DSM was able to obtain the underlying data said to support Corning's cure dose "results."

According to Bowman, the underlying data "does not support the conclusion that Examples 10-1 or 10-2 exhibit a cure dose that necessarily falls within the scope of the claims of the '103 patent." Ex. 2030 ¶ 120.

Bowman Table 6, reproduced below, summarizes Corning's underlying data produced to support its cure dose values. *Id.* ¶ 121.

Bowman Table 6

| Dose ($J/cm^2$) | Example 10-2 Secant Modulus (MPa) | Example 10-1 Secant Modulus (MPa) |
|---|---|---|
| 0.2 | 0.61±0.05 | 0.88±0.04 |
| 0.3 | 0.63±0.04 | 0.87±0.03 |
| 0.5 | 0.66±0.08 | 0.97±0.05 |
| 0.75 | 0.62±0.06 | 0.98±0.03 |
| 1.0 | 0.67±0.06 | 1.04±0.04 |
| 2.0 | 0.65±0.06 | 1.11±0.06 |

17

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

Bowman Figure 5, reproduced below, represents a curve fit for secant modulus (MPa) versus dose (J/cm$^2$) for Example 10-1 of Szum '157. *Id.* Fig. 5.



Bowman Fig. 5 depicts a plot of secant modulus v. dose
for Szum '157 Example 10-1

The R$^2$ fitting reported by Corning is said to be 0.9765.  Ex. 2030, 57.

Bowman testified that upon review of the Corning R$^2$ values, "I was immediately suspicious . . ." (*id.* ¶ 122), apparently because the "dose data . . . looks relatively constant" (*id.* ¶ 123).

Bowman asked DSM to independently analyze Corning's data using essentially the same approach used by DSM to analyze cure dose data of its experiments.  *Id.* ¶ 124.

Bowman Table 7, reproduced below, compares Corning's R$^2$ values vis-à-vis DSM's R$^2$ values.

18

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

Bowman Table 7

| Statistical Method | Example 10-1 | | Example 10-2 | |
|---|---|---|---|---|
| | Corning $R^2$ | DSM's Re-evaluation of Corning's $R^2$ | Corning $R^2$ | DSM's Re-evaluation of Corning's $R^2$ |
| Curve-fitting average values of modulus at each dose | 0.9765 | 0.5728 | 0.8958 | 0.4656 |

| Statistical Method | Example 10-1 | | Example 10-2 | |
|---|---|---|---|---|
| | Corning $R^2$ | DSM's Re-evaluation of Corning's $R^2$ | Corning $R^2$ | DSM's Re-evaluation of Corning's $R^2$ |
| Curve-fitting all values of modulus at each dose | - | 0.4805 | - | 0.0542 |

As a result of Corning's relatively lower $R^2$ values, which Bowman characterizes as "significantly low $R^2$ values," Bowman opines (Ex. 2030 ¶ 126 (footnote omitted)):

> Upon seeing such low $R^2$ values, a person of ordinary skill in the art would have immediately recognized that . . . Corning's data was subject to some type of systematic or experimental error (e.g., the use of a malfunctioning or uncalibrated radiometer) . . . . Accordingly, Corning's data set cannot eliminate systematic and experimental errors as an explanation as to why its data does not conform to the modulus-dose behavior predicted by Equation 1 [(see Ex. 2030 ¶ 116)] and as typically observed. (Ex. 2058).

19

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

Figure 1 of Exhibit 2058, reproduced below, shows equilibrium moduli ranging from about 65 to about 100% as a function of cure dose.



Depicted is a curve of modulus as a function of cure energy.

Corning's modulus curves show moduli ranging from (1) about 0.85 to about 1.2 MPa as a function of cure dose (Ex. 2030 Fig. 5), and (2) about 0.60 to about 0.65 MPa as a function of cure dose (*Id.* Fig. 6) for the compositions of Examples 10-1 and 10-2 of Szum '157, respectively.

According to Bowman, "[a]s indicated by Figure 1 in Exhibit 2058, as early as 1993, data for modulus as a function of dose was readily obtained[,] and data over a broad range of modulus values are indicated." *Id.* ¶ 131.

Corning has not pointed to any evidence that Winningham conducted any independent analysis of Corning's curve fitting. *Cf.* Ex. 2028, 761:19 – 762:9 (discussing, on cross-examination, an "Exhibit 130" and "Exhibit 131"—exhibits we have not found in the record and, in any event, would not be properly numbered exhibits).

20

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

In reply to Bowman's curve-fitting analysis, Corning submitted testimony of Dr. Elsa Reichmanis.  Ex. 1028.

Corning relies on Reichmanis to make two points:  (1) Corning's curve-fitting is based on a proper analysis, while DSM's curve-fitting is not; and (2) the difference in cure dose may be a result of the thickness of the films tested on behalf of Corning vis-à-vis those tested on behalf of DSM.

A first observation by Reichmanis is that Corning's modulus versus dose curves generally have the same overall appearance as typical modulus versus dose curves—steep initial rise then a generally leveling off.  *See, e.g.*, *id.* ¶ 74 (referring to Ex. 1047 Fig. 4.13), ¶ 79 (referring to Ex. 1050 Fig. 6).

Reichmanis therefore "find[s] nothing peculiar or suspicious about Corning's modulus versus dose curves for Examples 10-1 and 10-2." Ex. 1028 ¶ 80.

A second observation is that Bowman, in determining $R^2$ values, excluded the origin (data point 0,0) from the calculation.  *Id.* ¶ 83.

Reichmanis testified that "I have reviewed Corning's recalculation of its own $R^2$ values by excluding the origin (data point 0,0) from the calculation and I observed that they obtained $R^2$ values similar to what DSM obtained."  *Id.*

According to Reichmanis, "it makes [no] statistical sense to exclude the origin (data point 0,0) from the data."  *Id.* ¶ 84.

Reichmanis points to no credible underlying data to support her testimony.

Reichmanis notes that (*id.* ¶ 85):

> Regardless, the issues raised by DSM and Dr. Bowman regarding Corning's $R^2$ values are not dispositive, because what

21

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

matters is what dose is required to attain 95% of the maximum attainable modulus and not how well the curve fits to the data. For example, if one digitizes the above modulus vs. dose curve from . . . Ex. 1050 [(presumably referring to Figure 6)] . . . and calculates the $R^2$ with the origin (0,0), the adjusted $R^2$ is approximately 0.994, and without the point of origin (0,0), the adjusted $R^2$ is approximately 0.163. What I view in terms of Corning's data and their modulus vs. dose curves are entirely consistent with what I would expect for coatings that have a cure dose to attain 95% of the maximum attainable modulus of 0.37 J/cm$^2$ and 0.22 J/cm$^2$, respectively.

Reichmanis does not explain what recalculation of $R^2$ (presumably Figure 6 of Exhibit 1050) has to do with $R^2$ values associated with curve-fitting of Corning's and DMS's reproductions of Szum '157 Examples 10-1 and 10-2.

Moreover, unlike Bowman, who called attention to DSM calculations (*see, e.g.*, Ex. 2053), Reichmanis does not call our attention to documentation underlying her calculation of adjusted $R^2$.

*C. Discussion*

1. Arguments considered

In resolving this case on the merits, we consider only the arguments made in the Petition, the Response, and the Reply.

We find that:

(1)    Corning has *not* established by a preponderance of the evidence that Examples 10-1 and 10-2 inherently describe an inner primary coating meeting the "95% limitation" required by paragraph (b) of claim 1 of the '103 patent or paragraph (c) of claim 1 of the '508 patent, and

22

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

(2)    DSM has *not* established by a preponderance of the evidence that Examples 10-1 and 10-2 do *not* meet the required "95% limitation".

Accordingly, we do not find it necessary to consider DSM's Supplemental Response (Paper 75) or Petitioner's Reply thereto (Paper 76).

In reaching our decision that Corning has failed to establish inherency as to the "95% limitation," we have assumed that both Corning and DSM accurately reproduced the coatings of Szum '157. In light of our findings, it is not necessary to determine whether the coatings were accurately reproduced.

2. Corning's proofs

On the factual issue of whether Corning has established that Szum '157 inherently describes a coating having the required cure dose, there is conflicting testimony of Bowman and Reichmanis.

Both witnesses appear to be qualified scientists.

We have no reason to question the good faith of either witness and we believe they have testified faithfully to their respective opinions.

Nevertheless, to the extent that there is a conflict between the two witnesses with respect to Corning's *cure dose proofs*, we credit Bowman over Reichmanis.

The Bowman testimony is detailed and supported by underlying data, while the Reichmanis testimony is general and is not credibly supported by underlying data. 37 C.F.R. § 42.65(a), (b)(5).

Corning argues that Bowman ignored the origin (0,0 data point).

At a dose of zero (0) $J/cm^2$, Bowman tells us that the modulus would be "close to zero." Ex. 1034, 1097:25.

23

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

Reichmanis believes the origin should be included in any $R^2$ determination and maintains that the only thing that counts is the cure dose (not the $R^2$ value).  Ex. 1028 ¶¶ 84-85.

Fitting data points to a curve is important.

The data points, when properly fitted to a curve, permit one skilled in the art to determine whether 95% of the maximum attainable modulus is attainable at the relevant cure dose for a given composition.

According to the '103 patent, cure doses of 0.2, 0.3, 0.5, 0.75, 1.0, and 2.0 $J/cm^2$ are to be employed.  '103 patent 9:58-60; *see also* '508 patent 7:58-59.

A "dose-modulus curve was then created by plotting the modulus values vs. the dose and by fitting a curve through the data points." '103 patent 9:39-41.

The '103 patent and the '508 patent do not indicate that the data points are to include the origin (0,0 data point).

Reichmanis provides no credible explanation as to why the origin should be included in the face of the explicit disclosure of the '103 patent and the '508 patent.

Once the data points are curve-fitted, the "maximum" modulus surfaces at the point where the curve flattens out.  *See, e.g.*, Ex. 2030, Fig. 1 (essentially between a dose of 1.00 and 2.00 $J/cm^2$).

At a dose of 0.2, the modulus is essentially 0.5.

Once one skilled in the art has a properly fitted curve, determination of 95% of the maximum modulus is possible.

As seen visually in Figure 1, the maximum appears to be at a modulus of about 0.95 MPa.

24

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

As shown in Figure 1, the cure dose required to obtain 95% of the maximum attainable modulus was determined to be from 0.72 to 0.76 J/cm$^2$—a value outside the limits of claim 1 of the '103 patent and claim 1 of the '508 patent.

Corning has failed to establish that the properties of the compositions of Examples 10-1 and 10-2 of Szum '157 fall within the scope of the claims of either patent.

### 3. DSM's counter-tests

DSM is under no burden to establish that Examples 10-1 and 10-2 *do not* inherently describe coatings meeting the 95% limitation.

We address the DSM's counter-proofs to complete our analysis because those proofs have been addressed by DSM and Corning.

On the factual issue of whether DSM has established that Szum '157 *does not* inherently describe a coating having the required 95% cure dose, there is conflicting testimony of Bowman and Reichmanis.

The '103 patent indicates that cure dose tests should be performed on a sample having a thickness of "approximately 75 microns." '103 patent 9:28-29; '508 patent 7:53-57.

As noted earlier, both witnesses appear to be qualified scientists.

Again, we have no reason to question the good faith of either witness, and we believe they have testified faithfully to their respective opinions.

Nevertheless, to the extent that there is a conflict between the two witnesses with respect to DSM's *cure dose proofs*, on this factual issue, we credit Reichmanis over Bowman.

Reichmanis testified that the cure dose may be a function of sample thickness.  *See* Ex. 1028 ¶ 56 ("[A]s the thickness of the coatings increases,

25

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

the dose required to cure the coatings to a given degree also increases."
(citing Ex. 1038, 516 ("[L]ogic would predict that thicker films would be
cured to a lesser extent, at a given dose, than thinner films.")).

Reichmanis graphically illustrates the point, explaining (Ex. 1028
¶¶ 57, 58; Fig. 2):

> Less light (*i.e.*, fewer photons) in the deeper portions of the
> thicker film means that fewer photoinitiators are being activated
> by light to release free-radicals, resulting in fewer free-radical
> induced polymerization reactions. Consequently, thicker films
> will be cured to a lesser extent at a given dose than thinner
> films.



FIGURE 2
Depicted are thin and thick films showing free-radical
polymerizations in both

As is apparent in the thinner film (left side), a cure dose may react
with a larger percentage of monomers than in the thicker film (right side).

Bowman acknowledged that DSM did not use a coating having a
thickness of 75 microns: "I noticed it was 100 microns. I didn't correlate
the 100 microns [used by DSM] to the 75 microns [described by the '508
patent] and notice the difference." Ex. 1033, 866:2-4.

26

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

Reichmanis makes out a plausible factual basis for finding that cure dose may be a function of thickness, and Bowman has not provided a credible, scientifically based rationale to overcome Reichmanis' plausible basis.

DSM has failed to establish that Examples 10-1 and 10-2 do *not* inherently describe the 95% limitation in claim 1 of the patents.

### 4. Decision on the 95% limitations

Corning has the burden of proof, and has failed to sustain its burden of establishing by a preponderance of evidence that the prior art inherently describes the 95% limitation.

While DSM does not have any burden to disprove inherency, it failed to establish that the relevant limitation is not inherent..

A preponderance of evidence has not emerged on the factual question of whether Szum '157 Examples 10-1 and 10-2 inherently describe a composition within the scope of the claims of the '103 and '508 patents.

Hence, the party with the burden of proof necessarily loses. *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1580 n.11 (Fed. Cir. 1988).

### 5. Decisions on other issues

Corning's obviousness challenges fall with its failure to establish that the prior art inherently describes the 95% limitation—a limitation of all the claims of both patents.

### III. MOTIONS TO AMEND

In IPR2013-00043, DSM has filed a Motion to Amend (Paper 45) contingent on claim 12 of the '103 patent being held unpatentable.

27

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

In IPR2013-00044, DSM has filed a Motion to Amend (Paper 44) contingent on claim 17 of the '508 patent being held unpatentable.

Since claim 12 of the '103 patent and claim 17 of the '508 patent have not been held unpatentable, there is no occasion to reach or decide the motions to amend.

IV.    JUDGMENT

Accordingly, it is

ORDERED that Corning's request in IPR2013-00043 for cancellation of claims 1-18 of the '103 patent is *denied*;

FURTHER ORDERED that Corning's request in IPR2013-00044 for cancellation of claims 1-22 of the '508 patent is *denied*;

FURTHER ORDERED that the Motion to Amend in IPR2013-00043 is *dismissed* as moot;

FURTHER ORDERED that the Motion to Amend in IPR2013-00044 is *dismissed* as moot; and

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

28

IPR2013-00043 (Patent 7,171,103 B2)
IPR2013-00044 (Patent 6,961,508 B2)

For PETITIONER:

Michael L. Goldman
Jeffrey N. Townes
Edwin V. Merkel
LeClairRyan, A Professional Corporation
Michael.Goldman@leclairryan.com
Jeffrey.Townes@leclairryan.com
Edwin.Merkel@leclairryan.com

For PATENT OWNER:

Sharon A. Israel
Joseph A. Mahoney
Mayer Brown LLP
SIsrael@mayerbrown.com
JMahoney@mayerbrown.com

Trials@uspto.gov                                    Paper 104
Tel:  571-272-7822                        Entered: August 12, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————————

CORNING INCORPORATED
Petitioner

v.

DSM IP ASSETS B.V.
Patent Owner
————————————

Case IPR2013-00043 (Patent 7,171,103 B2)
Case IPR2013-00044 (Patent 6,961,508 B2)
————————————

Before FRED E. McKELVEY, GRACE KARAFFA OBERMANN,
JENNIFER S. BISK, SCOTT E. KAMHOLZ, and ZHENYU YANG,
*Administrative Patent Judges*.

McKELVEY, *Administrative Patent Judge*.

DECISION ON CORNING'S
REVISED REQUESTS FOR REHEARING
*37 C.F.R. § 42.71(d)(2)*

IPR2013-00043 (Patent 7,171,103 B2)
IRP2013-00044 (Patent 6,961,508 B2)

# I.    INTRODUCTION

Final Written Decisions in the above-identified *inter partes* review proceedings were entered on May 1, 2014.  IPR2012-00043 ("IPR 43"), Paper 95; IPR2013-00044 ("IPR 44") Paper 92.

Petitioner Corning timely filed Requests for Rehearing.  IPR 43, Paper 98; IPR 44, Paper 95.

The Board ordered Corning to re-present the Requests for Rehearing in a proper form.  IPR 43, Paper 99; IPR 44, Paper 96.

Corning timely presented Revised Requests for Rehearing.  IPR 43, Paper 100; IPR 44, Paper 97.

The Board then invited Patent Owner DSM to file Responses to the Revised Requests for Rehearing.  IPR 43, Paper 101; IPR 44, Paper 98.

DSM timely filed its Responses.  IPR 43, Paper 102; IPR 44, Paper 99.

We now address Corning's Revised Requests for Rehearing.

We do not consider Corning's original Requests for Rehearing.

Many of the arguments presented in Corning's Revised Requests for Rehearing amount to an attempt by Corning to re-argue its case.  It is not appropriate to use a request for rehearing to re-argue a case.  Nevertheless, we address below issues raised in the Requests for Rehearing.

## II.   Analysis

### A.  Corning Revised Request for Rehearing IPR 43

#### 1.  "Cure dose" limitation

Corning maintains that we overlooked a need to construe the "cure dose" limitation of the claims.  IPR 43, Paper 100, 1-2.

2

IPR2013-00043 (Patent 7,171,103 B2)
IRP2013-00044 (Patent 6,961,508 B2)

Corning reasons that construction of the "cure dose" limitation "is a critical aspect . . . that must be performed before determining validity." IPR 43, Paper 100, 2. We note that "patentability," not "validity," is an issue in an *inter partes* review proceeding.

The "cure dose" limitation in claim 1 of US Patent 7,171,103 B2 ("'103 patent") involved in IPR 43 reads: "a cure dose to attain 95% of the maximum attainable modulus of less than 0.65 J/cm$^2$." IPR 43, Ex. 1001, col. 13:19-20.

As noted in DSM's Response, we "held that Corning failed to prove by a preponderance of the evidence that [the coating compositions described in Szum '157 (WO 98/21157)] Examples 10-1 and 10-2 inherently possess the claimed "95%" cure dose limitation." IPR 43, Paper 102, 8. In other words, it does not matter what "cure dose" means because Corning through its witnesses Ms. Kouzmina and Dr. Winningham failed to establish that the compositions Corning made attained the "95%" property. Whatever Corning did to administer a cure dose becomes irrelevant, because the products tested were not proved to possess the property that the cure dose is supposed to impart. Hence, there is no occasion to construe what Corning would have had to do to establish that the Szum '157 examples meet the claimed "95%" "cure dose" limitation.

## 2. $R^2$ value

According to Corning, the Board incorporated $R^2$ values into the claim. IPR 43, Paper 100, 2-5.

Corning's rehearing argument misses the mark.

Our consideration and discussion of $R^2$ values relates to assessing the credibility of DSM's witness Bowman vis-à-vis the credibility of Corning's

3

IPR2013-00043 (Patent 7,171,103 B2)
IRP2013-00044 (Patent 6,961,508 B2)

witnesses.  $R^2$ values were not incorporated into the claims.  Rather, as explained in our Final Written Decision, our evaluation of $R^2$ values formed part of our analysis crediting Bowman over Corning's witnesses.

### 3.  Data without $R^2$ values

Corning argues that its data alone supports a finding that Szum '157 Example 10-2 inherently describes a cure dose limitation within the scope of claims of the involved patents.  IPR 43, Paper 100, 6-8.

The argument is said to have been raised on page 25 of the IPR 43 Petition (Paper 2) and pages 4-7 of the IPR 43 Reply (Paper 64).  Paper 100, 6.

Corning's argument relies on Ms. Kouzmina's testing and testimony and Dr. Winningham's testimony.  In entering a Final Written Decision, we did not credit that testing and testimony.  Instead, we credited the testimony of DSM's witness Dr. Bowman.  Nothing in the Requests for Rehearing convinces us that we should reevaluate our credibility assessment.

### 4.  Following the test procedure

On page 8 of the IPR 43 Request for Rehearing, Corning states that "nowhere in the [Final Written] Decision does the Board acknowledge that Corning followed the exact procedure set forth in the '103 patent when conducting its cure does tests on the prior art coatings."

Assuming *arguendo* that Corning followed the procedure set out in the '103 patent, we agree with DSM that "[t]he results must still be scientifically valid."  IPR 43, Paper 102, 13.  In this respect, we found that the results were not scientifically valid based essentially on the credible testimony of Dr. Bowman.

4

IPR2013-00043 (Patent 7,171,103 B2)
IRP2013-00044 (Patent 6,961,508 B2)

### 5. DSM test data

On page 10 of the IPR 43 Request for Rehearing, Corning suggests that we relied on DSM testing in reaching our finding that Corning failed to establish factually that the Szum '157 examples inherently describe the "cure dose" limitation.

We agree with DSM (IPR 43 Paper 102, 14) that Corning's failure to prove its case was in no way dependent on any faulty testing done by DSM. Our analysis of DSM testing was undertaken solely because Corning questioned the validity of DSM testing and because that testing was an issue raised in the proceedings. However, as noted in the Final Written Decision, Corning had the burden of proof and we found that it had failed to establish that Szum '157 Examples 10-1 and 10-2 inherently describe the "cure dose" limitation. IPR 43, Paper 100, 25.

### 6. Dr. Bowman's testimony

On page 12 of IPR 43 Request for Rehearing, Corning argues that we improperly credited Dr. Bowman's $R^2$ assessment.

We disagree for the reasons given in the Final Written Decision. Moreover, we agree generally with DSM's response to Corning's argument as presented in DSM's Opposition. Paper 102, 2:7 through 6:10.

On page 14, Corning says that Dr. Bowman has not been consistent. According to Corning, Dr. Bowman sometimes took into account the (0,0) point and other times he did not. As noted by DSM, to make the argument Corning had to rely on evidence filed in connection with IPR2013-00047. IPR 43 Paper 102, 6.

In effect, Corning at the rehearing stage attempts in IPR 43 to incorporate by reference evidence and argument presented in IPR2013-

5

IPR2013-00043 (Patent 7,171,103 B2)
IRP2013-00044 (Patent 6,961,508 B2)

00047.  Incorporation of evidence and argument from one IPR into another IPR is not permitted.  Moreover, Corning fails to tell us where it raised the argument in its Petition or Reply.  Therefore, we do not consider the IPR2013-00047 evidence.  However, even if the evidence were to be considered, as DSM points out, in IRP2013-00047 Dr. Bowman included a (0,0) data point because that data point represented actual data.  IPR2013-00047, Ex. 2029, Table 1.  In the case of IPR 43, the (0,0) point is not based on actual data.  There is no inconsistency in Dr. Bowman's approach.

### B.  Corning Revised Request for Rehearing IPR 44

Corning's IPR 44 Revised Request for Rehearing (IPR 44 Paper 95) appears to be essentially the same as Corning's IPR 43 Revised Request for Rehearing (IPR 43 Paper 100) (except for listings of claims of US Patent 6,961,508 patent in place of the claims of the '103 patent involved in IPR 43).

### III.  Order

Upon consideration of Corning's Revised Request for Rehearing in IPR 43 (IPR 43, Paper 100) and Corning's Revised Request for Rehearing in IPR 44 (IPR 44, Paper 95), it is

ORDERED that the Revised Requests for Rehearing are *denied*.

FURTHER ORDERED that the time for seeking judicial review begins to run with entry of this Decision.  37 C.F.R. § 90.3(b); IPR 43, Paper 103.

IPR2013-00043 (Patent 7,171,103 B2)
IRP2013-00044 (Patent 6,961,508 B2)

For PETITIONER:

Michael L. Goldman
Jeffrey N. Townes
Edwin V. Merkel
LeClairRyan, A Professional Corporation
Michael.Goldman@leclairryan.com
Jeffrey.Townes@leclairryan.com
Edwin.Merkel@leclairryan.com

For PATENT OWNER:

Sharon A. Israel
Joseph A. Mahoney
Mayer Brown LLP
SIsrael@mayerbrown.com
JMahoney@mayerbrown.com

7

**A36**

US007171103B2

(12) **United States Patent**　(10) **Patent No.:**　　US 7,171,103 B2
Eekelen et al.　　　　　　　　　　　(45) **Date of Patent:**　　　Jan. 30, 2007

(54) **COATED OPTICAL FIBERS**

(75) Inventors: **Jan van Eekelen**, Rozenburg (NL);
**Sandra Nagelvoort**, Vlaardingen (NL);
**Duurt Alkema**, The Haag (NL); **Paul
Buijsen**, Geleen (NL); **Huimin Cao**,
Addison, IL (US); **Robert W. Johnson**,
Algonquin, IL (US); **David M. Szum**,
Crystal Lake, IL (US)

(73) Assignee: **DSM IP Assets B.V**, Te Heerlen (NL)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/240,397**

(22) Filed: **Oct. 3, 2005**

(65) **Prior Publication Data**

US 2006/0024010 A1　Feb. 2, 2006

**Related U.S. Application Data**

(63) Continuation of application No. 10/421,946, filed on
Apr. 24, 2003, now Pat. No. 6,961,508.

(60) Provisional application No. 60/374,778, filed on Apr.
24, 2002.

(51) **Int. Cl.**
*G02B 6/00*　　　(2006.01)
*G02B 6/02*　　　(2006.01)
*G02B 6/22*　　　(2006.01)

(52) **U.S. Cl.** ...................... **385/144**; 385/123; 385/126;
385/127; 385/128; 385/145; 525/932; 522/96;
522/109; 522/110; 522/111; 522/112

(58) **Field of Classification Search** ................. 385/144
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,528,553 B1 * | 3/2003 | Komiya et al. | ................ | 522/96 |
| 6,539,152 B1 | 3/2003 | Fewkes et al. | | |
| 6,539,153 B2 * | 3/2003 | Fewkes et al. | .............. | 385/114 |
| 6,611,647 B2 * | 8/2003 | Berkey et al. | .............. | 385/123 |
| 6,714,712 B2 * | 3/2003 | Bishop et al. | .............. | 385/128 |
| 2002/0146225 A1* | 10/2002 | Bulters et al. | .............. | 385/125 |
| 2003/0215196 A1 | 11/2003 | Bulters et al. | | |

* cited by examiner

*Primary Examiner*—Frank G. Font
*Assistant Examiner*—Ryan Lepisto
(74) *Attorney, Agent, or Firm*—Nixon & Vanderhye, PC

(57)　　　　　　**ABSTRACT**

A coated optical fiber can have a primary coating and a
secondary coating, where the primary coating can have good
microbending resistance and is obtained by curing a com-
position having a high cure speed. In one example, a coated
optical fiber can include as optical fiber, a primary coating
and a secondary coating. The optical fiber can have an
attenuation increase of less than 0.650 dB/km at 1550 nm,
with the primary coating having a modulus retention ratio of
at least 0.5, a glass transition temperature of −35° C., and
where the primary coating is obtained by curing a primary
coating composition having a cure dose to attain 95% of the
maximum attainable modulus of less than 0.65 J/cm².

**18 Claims, 1 Drawing Sheet**



CORNING INCORPORATED 1001
Corning v. DSM
IPR2013-00043



FIGURE 1

US 7,171,103 B2

**1**

**COATED OPTICAL FIBERS**

CROSS REFERENCE TO RELATED
APPLICATIONS

This application is a continuation of U.S. Ser. No. 10/421,
946, filed Apr. 24, 2003, which claims the benefit of U.S.
Provisional Ser. No. 60/374,778, filed on Apr. 24, 2002.
These applications, in their entirety, are incorporated herein
by reference.

FIELD OF THE INVENTION

The present invention relates to a coated optical fiber
comprising a primary and secondary coating, to a radiation
curable primary coating composition, to a combination of a
primary and secondary coating, and to a ribbon comprising
at least one of said coated optical fibers.

BACKGROUND OF THE INVENTION

Because optical fibers are fragile and easily broken, the
optical fibers are usually coated with a protective coating
system, for instance with a soft "cushioning" primary coat-
ing that is in contact with the fiber and with a relatively hard
secondary coating surrounding the primary coating. In addi-
tion, the coating system may be used to reduce attenuation,
i.e. the loss of optical power as light travels down a fiber, as
a result of microbending of the fiber. Providing such coat-
ings should however not be at the expense of the cure speed
of coating compositions, as this would limit line speeds in
fiber drawing and therewith increase overall production
costs. Accordingly, one of the objects of the present inven-
tion is to provide a coated optical fiber having a primary
coating and a secondary coating, wherein the primary coat-
ing has a high cure speed and provides good microbending
resistance.

U.S. applications Ser. Nos. 09/989,703; 09/717,377; and
U.S. Pat. No. 6,528,553 discuss primary coatings and
microbending. All three documents are hereby incorporated
in their entirety by reference.

SUMMARY OF THE INVENTION

The present invention provides a coated optical fiber
having a primary coating and a secondary coating, wherein
the primary coating provides good microbending resistance
and is obtained by curing a composition having a high cure
speed.

In one embodiment, the present invention provides a
coated optical fiber comprising:

(i) an optical fiber;

(ii) a primary coating; and

(iii) a secondary coating;

wherein

(a) said coated optical fiber has an attenuation increase of
less than 0.650 dB/km at 1550 nm;

(b) said primary coating has a modulus retention ratio
after hydrolytic aging of at least 0.5 and/or a glass
transition temperature below −35° C.; and

(c) said primary coating is obtained by curing a primary
coating composition having a cure dose to attain 95%
of the maximum attainable modulus of less than 0.65
J/cm$^2$.

**2**

Furthermore, the present invention provides inner primary
coating composition having a low in-situ modulus, a high
cure speed, and good modulus retention after hydrolytic
aging.

In one embodiment, the present invention provides an
inner primary coating composition having:

(a) an in-situ modulus (after cure) of less than 0.6 MPa;

(b) a cure dose to attain 95% of the maximum attainable
modulus of less than 0.65 J/cm$^2$; and

(c) a modulus retention ratio (after cure) of at least 0.6 after
hydrolytic aging.

In another embodiment, the present invention provides an
inner primary coating composition having:

(a) an in-situ modulus (after cure) of less than 0.56 MPa;

(b) a cure dose to attain 95% of the maximum attainable
modulus of less than 0.65 J/cm$^2$; and

(c) a modulus retention ratio (after cure) of at least 0.5 after
hydrolytic aging.

BRIEF DESCRIPTION OF THE FIGURE

FIG. **1** shows a schematic illustration for an in-situ
modulus test sample.

DETAILED DESCRIPTION OF THE
INVENTION

The present invention provides a coated optical fiber
having a primary coating and a secondary coating, wherein
the primary coating provides good microbending resistance
and is obtained by curing a composition having a high cure
speed.

Preferably, the coated optical fiber has an attenuation
increase of less than 0.650 dB/km at 1550 nm, for instance
less than 0.5 or less than 0.4 dB/km at 1550 nm.

Preferably, the primary coating is obtained by curing a
primary coating composition, wherein the composition has
a cure dose to attain 95% of the maximum attainable
modulus of less than 0.65 J/cm$^2$, for instance less than 0.55
J/cm$^2$, less than 0.45 J/cm$^2$, or less than 0.35 J/cm$^2$.

Preferably, the primary coating has an in-situ modulus of
less than 0.65 MPa, for instance less than 0.6 MPa, less than
0.56 MPa, less than 0.54 or less than 0.52 MPa.

Preferably, the primary coating also has a good modulus
retention, in particular under humid conditions. Accordingly,
it is preferred that the ratio of the equilibrium modulus of the
primary coating after aging for 8 weeks at 85° C. and at 85%
relative humidity to the initial equilibrium modulus after
cure is greater than 0.5, for instance greater than 0.6, greater
than 0.65, greater than 0.7, greater than 0.75, or greater than
0.9. This ratio is also referred to as "modulus retention ratio
after hydrolytic aging".

Furthermore, it is preferred that the primary coating has a
glass transition temperature (Tg) below −10° C., for instance
below −25° C., below −35° C., or even below −45° C. The
Tg is generally above −100° C.

The elongation to break of the primary coating is prefer-
ably at least 75%, for instance at least 120% or at least
150%. The elongation to break is generally below 500%.

Generally, the Tg of the secondary coating is about 40° C.
or higher, for instance about 50° C. or higher or about 60°
C. or higher. The Tg is generally below 200° C.

The tensile modulus of the secondary coating is prefer-
ably at least 200 MPa, for instance at least 400 MPa or at
least 500 MPa. The tensile modulus will generally be below
3,000 MPa, for instance below 2,000 MPa.

US 7,171,103 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

The secondary coating will preferably have an elongation to break of at least 2%, for instance at least 10% or at least 20%. The elongation is generally below 100%.

In order to, for instance, reduce thermal stresses in the coating system, it is preferred that the ratio of the expansion coefficient of the primary coating in the rubbery region to the secondary coating in the glassy region is below 3.0, for instance below 2.0, such as about 1.7.

The primary coating generally will be obtained by curing a radiation curable coating composition based on (meth) acrylate functional oligomers and radiation-curable monomers with photoinitiator(s) and additives. Examples of additives include a stabilizer and a silane coupling agent. The adhesion to the glass as measured according to adhesion test described in WO 99/15473, which is incorporated herein in its entirety by reference, is at least about 5 g in force both at 50% RH and at 95% RH (Relative Humidity). Preferably, the adhesion is at least about 10 g in force, for instance at least about 20 g in force. Generally, the adhesion will be less than about 200 g in force, e.g. less than 100 g in force, in view of strippability considerations in ribbon systems,

The primary coating composition of the present invention generally comprises

(A) 20–98% by wt. of at least one oligomer having a molecular weight of about 1000 or higher, for instance 20–80% by wt. or 30–70% by wt.,

(B) 0–80% by wt. of one or more reactive diluents, for instance 5–70% by wt., 10–60% by wt., or 15–60% by wt.,

(C) 0.1–20% by wt. of one or more photoinitiators for initiation of a radical polymerisation reaction, for instance 0.5–15% by wt., 1–10% by wt., or 2–8% by wt.,

(D) 0–5% by wt. of additives,

wherein the total amount adds up to 100 wt. %.

Preferably, the oligomer (A) is a urethane (meth)acrylate oligomer, comprising a (meth)acrylate group, urethane groups and a backbone. (Meth)acrylate includes acrylate as well as methacrylate functionality. The backbone is generally derived from a polyol which has been reacted with a diisocyanate and hydroxy alkyl acrylate. However, urethane-free ethylenically unsaturated oligomers may also be used.

Examples of suitable polyols are polyether polyols, polyester polyols, polycarbonate polyols, polycaprolactone polyols, acrylic polyols, and the like. These polyols may be used either individually or in combinations of two or more. Preferred polyols include polyether polyols, e.g. polytetrahydrofuran polyols, poly(oxyethylene-oxybutylene) polyols, or polypropylene glycol polyols such as Acclaim 4200 or Acclaim 4200N (commercially available from Lyondell), optionally in combination with polyester polyols (e.g. Priplast 3190, commercially available from Uniqema). Accordingly, in one embodiment, the present oligomers may have a backbone that is derived from (i) one or more polyether polyols, or (ii) one or more polyether polyols in combination with one or more polyester polyols.

There are no specific limitations to the manner of polymerization of the structural units in these polyols. Any of random polymerization, block polymerization, or graft polymerization is acceptable. Examples of suitable polyols, polyisocyanates and hydroxylgroup-containing (meth)acrylates are disclosed in WO 00/18696, which is incorporated herein in its entirety by reference.

The reduced number average molecular weight derived from the hydroxyl number of these polyols is usually from about 50 to about 25,000, preferably from about 500 to about 15,000, more preferably from about 1,000 to about 8,000, and most preferred, from about 1,500 to 6,000. In one embodiment, the polyol(s) used in preparing the oligomer have a molecular weight of at least 2,500 g/mol, for instance at least 3,000 g/mol or at least 4000 g/mol.

The ratio of polyol, di- or polyisocyanate (as disclosed in WO 00/18696), and hydroxyl group-containing (meth)acrylate used for preparing the urethane (meth)acrylate is generally determined so that about 1.1 to about 3 equivalents of an isocyanate group included in the polyisocyanate and about 0.1 to about 1.5 equivalents of a hydroxyl group included in the hydroxyl group-containing (meth)acrylate are used for one equivalent of the hydroxyl group included in the polyol.

In the reaction of these three components, an urethanization catalyst such as copper naphthenate, cobalt naphthenate, zinc naphthenate, di-n-butyl tin dilaurate, triethylamine, and triethylenediamine, 2-methyltriethyleneamine, is usually used in an amount from about 0.01 to about 1 wt % of the total amount of the reactant. The reaction is carried out at a temperature from about 10 to about 90° C., and preferably from about 30 to about 80° C.

The number average molecular weight of the urethane (meth)acrylate used in the composition of the present invention is preferably in the range from about 1,200 to about 20,000 g/mol, for instance from about 2,200 to about 10,000 g/mol. If the number average molecular weight of the urethane (meth)acrylate is less than about 1000 g/mol, the resin composition tends to vitrify at room temperature; on the other hand, if the number average molecular weight is larger than about 20,000, the viscosity of the composition becomes high, making handling of the composition difficult.

Suitable reactive diluents (B) are polymerizable monofunctional vinyl monomers and polymerizable polyfunctional vinyl monomers. Examples of these reactive diluents are disclosed in WO 97/42130, which is incorporated herein in its entirety by reference.

Preferred reactive diluents include alkoxylated alkyl substituted phenol acrylate, such as ethoxylated nonyl phenol acrylate, propoxylated nonyl phenol acrylate, isodecyl acrylate, and alkoxylated bisphenol A diacrylate such as ethoxylated bisphenol A diacrylate. In one embodiment, it is preferred to include one or more alkoxylated aliphatic polyacrylates, for instance an alkoxylated aliphatic diacrylate such as alkoxylated (e.g. propoxylated) neopentyl glycol diacrylate. In another embodiment, it is preferred to include one or more diluents comprising one or more aromatic rings. Aromatic diluents may be helpful in embodiments where a comparatively high refractive index is desired. In one embodiment, the compositions comprise 0–2 wt % vinyl caprolactam, e.g. about 0 wt %.

Preferably, the Photoinitiators (C) are Free Radical Photoinitiators.

Free-radical photoinitiators are generally divided into two classes according to the process by which the initiating radicals are formed. Compounds that undergo unimolecular bond cleavage upon irradiation are termed Type I or homolytic photoinitiators.

If the excited state photoinitiator interacts with a second molecule (a coinitiator) to generate radicals in a bimolecular reaction, the initiating system is termed a Type II photoinitiator. In general, the two main reaction pathways for Type II photoinitiators are hydrogen abstraction by the excited initiator or photoinduced electron transfer, followed by fragmentation.

US 7,171,103 B2

| 5 | 6 |

Examples of suitable free-radical photoinitiators are disclosed in WO 00/18696 which is incorporated herein in its entirety by reference. In one embodiment, the compositions comprise 1–4 wt % of one or more photoinitiators, e.g. 2–3.5 wt %. In one embodiment, the present invention comprises 0–2.2 wt % 2,4,6-trimethylbenzoyldiphenylphosphine oxide, for instance 1–2 wt % (commercially available, e.g., as Lucirin TPO from BASF AG).

In one preferred embodiment of the present invention at least one of the photoinitiators contains a phosphorous, sulfur or nitrogen atom. It is even more preferred that the photoinitiator package comprises at least a combination of a photoinitiator containing a phosphorous atom and a photoinitiator containing a sulfur atom.

In another preferred embodiment of the invention, at least one of the compounds (C) is an oligomeric or polymeric photoinitiator.

As an additive (D), an amine compound can be added to the liquid curable resin composition of the present invention to prevent generation of hydrogen gas, which causes transmission loss in the optical fibers. As examples of the amine which can be used here, diallylamine, diisopropylamine, diethylamine, diethylhexylamine, and the like can be given.

In addition to the above-described components, various additives such as antioxidants (e.g. 1,3,5-tris(4-tert-butyl-3-hydroxy-2,5-dimethylbenzyl)-1,3,5-triazine-2,4,6-(1H, 3H,5H)-trione), UV absorbers, light stabilizers (e.g. bis (1octoxy-2,2,6,6-tetramethyl-4-piperidyl) sebacate), silane coupling agents (e.g. mercaptofunctional silane coupling agents), coating surface improvers, heat polymerization inhibitors, leveling agents, surfactants, colorants, preservatives, plasticizers, lubricants, solvents, fillers, aging preventives, and wettability improvers can be used in the liquid curable resin composition of the present invention, as required. In one embodiment, the compositions comprise 0–0.2 wt % of the antioxidant thiodiethylenebis(3,5-di-tert-butyl-4-hydroxy) hydrocinnamate (commercially available as Irganox 1035), e.g. about 0 wt %.

In general, optical fibers are coated first with a primary coating and subsequently with a secondary coating. Suitable secondary coatings are disclosed, for instance, in U.S. Pat. No. 6,080,483, which is hereby incorporated in its entirety by reference. The coatings can be applied as a wet-on-wet system (without first curing of the primary) or as a wet-on-dry system. The primary coating can be colored with a die, or secondary coatings can be colored with pigments or dies, or a clear secondary can be further coated with an ink. The primary and secondary coatings generally have a thickness of about 30 μm each. An ink coating generally has a thickness of about 5 μm (3–10 μm).

The coated and preferably colored optical fibers can be used in a ribbon comprising a plurality of said optical fibers, generally in a parallel arrangement. The plurality of optical fibers is further coated with one or more matrix materials in order to obtain a ribbon. The present invention therefore further relates to a ribbon comprising a plurality of coated and preferably colored optical fibers, generally in a parallel arrangement, said coated optical fiber comprising at least a primary coating according to the present invention and preferably a secondary coating according to the present invention.

The invention will be further elucidated by the following examples, which should be regarded as illustrating the invention and not as limiting the invention.

EXAMPLES

Examples 1–7 and Comparative Examples A–D

Primary coating compositions were prepared according to the formulations listed in Table 1 below (amounts of ingredients listed in weight% relative to total weight of the composition). Also listed are physical properties of the primary coating (see below for sample preparation and test methods).

TABLE 1

Primary coating compositions

| Ingredients | Ex. A | Ex. B | Ex. C | Ex. D |
|---|---|---|---|---|
| Oligomer 1[a] | 68.60 | — | — | — |
| Oligomer 2[b] | — | 52.66 | 56.90 | — |
| Oligomer 3[c] | — | — | — | — |
| Oligomer 4[d] | — | — | — | 77.10 |
| Ethoxylated Nonyl Phenol Acrylate | 7.0 | 21.43 | 17.02 | — |
| Tridecyl acrylate | 7.0 | — | — | — |
| Isodecyl acrylate | — | — | 22.00 | 8.5 |
| Phenoxyethylacrylate | — | — | — | — |
| Isobornyl acrylate | — | 10.71 | — | — |
| Lauryl acrylate | — | 6.0 | — | — |
| Propoxylated (3) Trimethylolpropane triacrylate | — | — | — | — |
| Ethoxylated bisphenol diacrylate | — | — | — | — |
| Vinyl Caprolactam | 4.0 | 6.31 | — | 5.0 |
| Ethoxylated Aliphatic Acrylate (Ebecryl 111 from UCB Chemicals) | 5.0 | — | — | — |
| Propoxylated (2) Neopentyl Glycol Diacrylate (SR9003) | 4.0 | — | — | 5.0 |
| Lucerine TPO (photoinitiator) | 1.3 | 1.58 | 1.71 | 1.3 |
| Irgacure 184 (photoinitiator) | 1.8 | — | 1.00 | 1.8 |
| Irganox 1035 (stabilizer) | 0.3 | 0.32 | 0.34 | 0.3 |
| Irganox 3790 (stabilizer) | — | — | — | — |
| Cyanox 1790 (stabilizer) | — | — | — | — |
| Tinuvin 123 | — | — | — | — |

US 7,171,103 B2

7                                                                                                                8

TABLE 1-continued

| | Primary coating compositions | | | |
| --- | --- | --- | --- | --- |
| | Ex. A | Ex. B | Ex. C | Ex. D |
| Silane coupling agent | 1.0 | 1.0 | 1.0 | 1.0 |
| Properties | | | | |
| Viscosity (mPas) | 5656 | 7500 | 8100 | 8840 |
| Tensile Strength (MPa) | 0.7 | 1.3 | 0.9 | 1.7 |
| Elongation at break (%) | 230 | 170 | 160 | 200 |
| Secant modulus (MPa) | 0.7 | 0.9 | 1.5 | 1.1 |
| Cure dose to attain 95% of modulus (J/cm$^2$) | 0.21 | 0.3 | 0.7 | 0.3 |
| Tg (° C.) | −51 | −25 | −45 | −30 |
| Measured shear modulus $G_{measured}$ (MPa) | 0.145 | 0.22 | 0.1 | ND |
| Primary coating thickness (micron) | 34 | 30 | 25 | ND |
| In-situ Modulus (MPa) | 0.58 | 0.89 | 0.29 | ND |
| Microbending attenuation increase @ 1310 nm (dB/km) | 0.185 | 0.512 | 0.2 | 0.182–0.205 |
| Microbending attenuation increase @ 1550 nm (dB/km) | 0.709 | 1.473 | 0.454 | 0.589–0.762 |
| Microbending attenuation increase @ 1700 nm (dB/km) | 2.61 | 3.807 | 1.54 | 1.80–2.38 |
| Modulus retention ratio after hydrolytic aging | 0.5 | 0.76 | ND | 0.25 |

*prepared by reacting Acclaim4200, toluenediisocyanate, and hydroxyethylacrylate in the presence of catalyst and stabilizer.
[b]prepared by reacting PTGL2000 (polytetrahydrofuran poyol with Mw of about 2000), isophoronediisocyanate and hydroxyethylacrylate in the presence of catalyst and stabilizer.
[c]prepared by reacting Acclaim4200, Priplast3190, isophoronediisocyanate, and hydroxyethylacrylate in the presence of catalyst and stabilizer.
[d]prepared by reacting Acclaim4200N, Priplast3190, isophoronediisocyanate, and hydroxyethylacrylate in the presence of catalyst and stabilizer.

TABLE 2

| | Primary coating compositions | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Ex. 1 | Ex. 2 | Ex. 3 | Ex. 4 | Ex. 5 | Ex. 6 | Ex. 7 |
| Ingredients | | | | | | | |
| Oligomer 1* | 66.15 | — | — | 74.10 | 66.4 | 66.0 | 70.60 |
| Oligomer 2* | — | — | — | — | — | — | — |
| Oligomer 3* | — | 77.10 | — | — | — | — | — |
| Oligomer 4* | — | — | 66.20 | — | — | — | — |
| Ethoxylated Nonyl Phenol Acrylate | 5.0 | — | 10.0 | — | 5.0 | 5.0 | 6.0 |
| Tridecyl acrylate | — | — | — | — | — | — | — |
| Isodecyl acrylate | 8.5 | 8.5 | 8.5 | 10.0 | 8.5 | 8.5 | 8.5 |
| Phenoxyethylacrylate | 4.0 | — | — | — | 4.0 | 4.0 | — |
| Isobornyl acrylate | — | — | — | — | — | — | — |
| Lauryl acrylate | — | — | — | — | — | — | — |
| Propoxylated (3) Trimethylolpropane triacrylate | 4.0 | — | 5.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| Ethoxylated bisphenol diacrylate | 2.0 | — | 2.0 | — | 2.0 | 2.0 | 2.0 |
| Vinyl Caprolactam | — | 5.0 | — | — | — | — | — |
| Ethoxylated Aliphatic Acrylate (Ebecryl 111 from UCB Chemicals) | — | — | — | — | — | — | — |
| Propoxylated (2) Neopentyl Glycol Diacrylate (SR9003) | 4.0 | 5.0 | 3.0 | 6.0 | 4.0 | 4.0 | 3.0 |
| Lucerine TPO (photoinitiator) | 1.5 | 1.3 | 1.3 | 1.3 | 1.5 | 2.3 | 1.3 |
| Irgacure 184 (photoinitiator) | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 |
| Irganox 1035 (stabilizer) | — | 0.3 | — | — | — | — | — |
| Irganox 3790 (stabilizer) | 1.4 | — | 0.7 | — | 1.4 | 1.4 | 1.4 |
| Cyanox 1790 (stabilizer) | — | — | — | 1.4 | — | — | — |
| Tinuvin 123 | 0.4 | — | — | 0.4 | 0.4 | — | 0.4 |
| Silane coupling agent | 1.25 | 1.0 | 1.5 | 1.0 | 1.0 | 1.0 | 1.0 |
| Properties | | | | | | | |
| Viscosity (mPas) | 6134 | 8500 | 6673 | 8761 | 6329 | 5850 | 6300 |
| Tensile Strength (MPa) | 2.36 | 0.8 | 1.8 | 1.085 | 1.89 | 2.56 | 1.6–1.9 |
| Elongation at break (%) | 184 | 150 | 160 | 171 | 163 | 173 | 170 |
| Secant modulus (MPa) | 0.98 | 0.9 | 0.86 | 1.14 | 1.06 | 0.98 | 0.9 |
| Cure dose to attain 95% of modulus (J/cm$^2$) | 0.47 | ND | 0.32 | 0.51 | 0.6 | 0.3–0.4 | 0.4–0.5 |

**A42**

US 7,171,103 B2

**9**             **10**

TABLE 2-continued

| | Primary coating compositions | | | | | | |
| | Ex. 1 | Ex. 2 | Ex. 3 | Ex. 4 | Ex. 5 | Ex. 6 | Ex. 7 |
|---|---|---|---|---|---|---|---|
| Tg (° C.) | −47.4 | ND | −23.2 | −50.4 | −50 | −52 | −52 |
| Measured shear modulus $G_{measured}$ (MPa) | 0.16 | 0.17 | 0.16 | 0.15 | 0.12 | 0.15 | 0.15 |
| Primary coating thickness (micron) | 28 | 30 | 27 | 30 | 28 | 28 | 31 |
| In-situ Modulus (MPa) | 0.55 | 0.65 | 0.54 | 0.54 | 0.40 | 0.51 | 0.59 |
| Microbending attenuation increase @ 1310 nm (dB/km) | 0.116 | 0.184 | 0.117 | 0.213 | 0.135 | ND | 0.115 |
| Microbending attenuation increase @ 1550 nm (dB/km) | 0.365 | 0.405 | 0.375 | 0.628 | 0.465 | ND | 0.442 |
| Microbending attenuation increase @ 1700 nm (dB/km) | 1.168 | 0.960 | 1.148 | 1.806 | 1.504 | ND | 1.434 |
| Modulus retention ratio after hydrolytic aging | ND | ND | ND | 0.64 | ND | ND | 0.80 |

*See (footnotes of) Table 1 for details on oligomers.

Test Methods

(i) Cure Dose

The cure speed of the compositions was determined as the cure dose required to attain 95% of the maximum attainable modulus. This cure dose was determined by Dose vs. Modulus curve analysis. Hereto, 6 radiation-cured sample films of each composition were prepared, with each sample film being obtained by applying an approximately 75 microns thick composition layer on a plate and subsequently curing the composition layer. Each composition layer was cured with a different dose: 0.2, 0.3, 0.5, 0.75, 1.0, and 2.0 J/cm² respectively. Six specimens were cut from the center portion of each prepared sample film. A Universal Testing Instrument, INSTRON Model 4201 equipped with a suitable personal computer and software "Series IX Materials Testing System" was used to measure the modulus of each specimen. The modulus measurements were then entered into the software package and the calculations were automatically performed with a determination of the average modulus for each film sample. The dose-modulus curve was then created by plotting the modulus values vs. the dose and by fitting a curve through the data points. The "cure dose" of the coating composition was determined to be the dose at which 95% of the ultimate secant modulus is attained.

(ii) Tensile Strength, Elongation and Modulus Test Method

The tensile strength, elongation and secant modulus of cured samples were tested using a universal testing instrument, Instron Model 4201 equipped with a personal computer and software "Series IX Materials Testing System." The load cells used were 4.4 Kg capacity. The ASTM D638M was followed, with the following modifications.

A drawdown of each material to be tested was made on glass plate and cured using a UV processor. A minimum of eight test specimens, having a width of 12.7.±−.0.005 mm and a length of 12.7 cm, were cut from the cured film. To minimize the effects of minor sample defects, sample specimens were cut parallel to the direction in which the drawdown of the cured film was prepared. If the cured film was tacky to the touch, a small amount of talc was applied to the film surface using a cotton tipped applicator.

The test specimens were then removed from the substrate. Caution was exercised so that the test specimens were not stretched past their elastic limit during the removal from the substrate. If any noticeable change in sample length had taken place during removal from the substrate, the test specimen was discarded.

If the top surface of the film was talc coated to eliminate tackiness, then a small amount of talc was applied to the bottom surface of test specimen after removal from the substrate. The average film thickness of the test specimens was determined. At least five measurements of film thickness were made in the area to be tested (from top to bottom) and the average value used for calculations. If any of the measured values of film thickness deviates from the average by more than 10% relative, the test specimen was discarded. All specimens came from the same plate.

The crosshead speed was set to 25.4 mm/min, and the crosshead action was set to "return at break". The crosshead was adjusted to 50.8 mm jaw separation. The air pressure for the pneumatic grips was turned on and set to approximately 1.5 Kg/cm².

After the Instron test instrument had been allowed to warm-up for fifteen minutes, it was calibrated and balanced following the manufacturer's operating procedures.

The temperature near the Instron instrument was measured and the humidity was measured at the location of the humidity gauge. This was done just before beginning measurement of the first test specimen.

Specimens were only analyzed if the temperature was within the range 23±1.0° C. and the relative humidity was within 50±5%. The temperature was verified as being within this range for each test specimen. The humidity value was verified only at the beginning and the end of testing a set of specimens from one plate.

Each test specimen was tested by suspending it into the space between the upper pneumatic grips such that the test specimen was centered laterally and hanging vertically. Only the upper grip was locked. The lower end of the test specimen was pulled gently so that it has no slack or buckling, and it was centered laterally in the space between the open lower grips. While holding the specimen in this position, the lower grip was locked.

The sample number was entered and sample dimensions into the data system, following the instructions provided by the software package.

The temperature and humidity were measured after the last test specimen from the current drawdown was tested. The calculation of tensile properties was performed automatically by the software package.

The values for tensile strength, % elongation, and secant or segment, modulus were checked to determine whether any one of them deviated from the average enough to be an "outlier." If the modulus value was an outlier, it was

US 7,171,103 B2

11

discarded. If there were less than six data values for the tensile strength, then the entire data set was discarded and repeated using a new plate.

(iii) Viscosity

The viscosity was measured using a Physica MC10 Viscometer. The test samples were examined and if an excessive amount of bubbles was present, steps were taken to remove most of the bubbles. Not all bubbles need to be removed at this stage, because the act of sample loading introduces some bubbles.

The instrument was set up for the conventional Z3 system, which was used. The samples were loaded into a disposable aluminum cup by using the syringe to measure out 17 cc. The sample in the cup was examined and if it contains an excessive amount of bubbles, they were removed by a direct means such as centrifugation, or enough time was allowed to elapse to let the bubbles escape from the bulk of the liquid. Bubbles at the top surface of the liquid are acceptable.

The bob was gently lowered into the liquid in the measuring cup, and the cup and bob were installed in the instrument. The sample temperature was allowed to equilibrate with the temperature of the circulating liquid by waiting five minutes. Then, the rotational speed was set to a desired value which will produce the desired shear rate. The desired value of the shear rate is easily determined by one of ordinary skill in the art from an expected viscosity range of the sample.

The instrument panel read out a viscosity value, and if the viscosity value varied only slightly (less than 2% relative variation) for 15 seconds, the measurement was complete. If not, it is possible that the temperature had not yet reached an equilibrium value, or that the material was changing due to shearing. If the latter case, further testing at different shear rates will be needed to define the sample's viscous properties. The results reported are the average viscosity values of three test samples.

(iv) Glass Transition Temperature

The elastic modulus (E'), the viscous modulus (E''), and the tan delta (E''/E'), which is an indication of the material's $T_g$, of the examples were measured using a Rheometrics Solids Analyzer (RSA-II), equipped with: 1) a personal computer having MS-DOS 5.0 operating system and having Rhios® software (Version 4.2.2 or later) loaded, and 2) a liquid nitrogen controller system for low-temperature operation.

The test samples were prepared by casting a film of the material, having a thickness in the range of 0.02 mm to 0.4 mm, on a glass plate. The sample film was cured using a UV processor. A specimen approximately 35 mm (1.4 inches) long and approximately 12 mm wide was cut from a defect-free region of the cured film. For soft films, which tend to have sticky surfaces, a cotton-tipped applicator was used to coat the cut specimen with talc powder.

The film thickness of the specimen was measured at five or more locations along the length. The average film thickness was calculated to ±0.001 mm. The thickness cannot vary by more than 0.01 mm over this length. Another specimen was taken if this condition was not met. The width of the specimen was measured at two or more locations and the average value calculated to ±0.1 mm.

The geometry of the sample was entered into the instrument. The length field was set at a value of 23.2 mm and the measured values of width and thickness of the sample specimen were entered into the appropriate fields.

12

Before conducting the temperature sweep, moisture was removed from the test samples by subjecting the test samples to a temperature of 80° C. in a nitrogen atmosphere for 5 minutes. The temperature sweep used included cooling the test samples to about −60° C. or about −80° C. and increasing the temperature at about 1/minute until the temperature reached about 60° C. to about 70° C. The test frequency used was 1.0 radian/second. The DMA instrument produced a plot of the data on the computer screen. The temperature at which E' is 1,000 MPa and E' is 100 MPa was calculated from this plot, as well as the tan delta peak. The temperature corresponding with the tan delta peak is reported as the glass transition temperature (Tg).

(v) In-Situ Modulus

A glass optical fiber was coated using a primary composition according to Table 1 and a commercial secondary composition (secant modulus 750 MPa, elongation at break 25%, glass transition temperature 55° C., coefficient of expansion in the glassy region <$100 \times 10^{-6}$/° C.). The thus obtained coated fiber was then placed in a metal sample fixture, as schematically shown in FIG. **1**: A small portion of the coating layer was stripped in the middle of the fiber; the length of the bottom part of the fiber was cut to be exactly 1 cm; the bottom of the fiber was inserted into a micro tube in the fixture; the micro tube consisted of two half hollow cylinders; its diameter was made to be the same as the fiber outer diameter; the fiber was tightly gripped after the screw was tightened; the gripping force on the secondary coating surface was uniform and no significant deformation occurred in the coating layer. The fixture with the fiber was then mounted on DMA (same instrument as used to determine the glass transition temperature). The metal fixture was clamped by the bottom grip. The top grip was tightened, pressing on the top portion of the coated fiber to the extent that it crushed the coating layer. The DMA was set to the shear sandwich mode to measure the shear modulus of the primary coating. Under the force F, the primary coating layer is sheared with a displacement D while essentially no deformation occurs in the stiff secondary coating. The test frequency used was 1.0 radian/second. The shear strain S (=$D/T_p$) was set to be 0.05. With this low level of strain and stress, the deformation was proven to be in the linear viscoelastic region and no delamination occurred at the interface of glass and primary coating. The shear modulus G was thus obtained (values indicated in Table 1). This shear modulus G was then corrected for stretch of the glass during measurement by the following formula:

$$1/G_{corrected} = 1/G_{measured} - 1/G_{glass}, \text{ wherein } G_{glass} \text{ is a glass stiffness factor and was taken to be } 0.85 \text{ MPa.}$$

$G_{corrected}$ was then further corrected by adjusting for the real thickness of the primary coating (the thickness assumed when obtaining $G_{measured}$ was always 30 micron), resulting in G. See Table 1 for the real thickness of the primary coatings. Finally, the in-situ modulus E was calculated with the following formula:

$$E=2(1+v)G=3G, \text{ wherein } v \text{ is the primary coating Poisson ratio=0.5.}$$

(vi) Modulus Retention Ratio After Hydrolytic Aging

An elastic modulus E' curve was determined according to the method described in method (iv) above, except that the cured film was aged for 8 weeks at a temperature of 85° C. at 85% relative humidity. The equilibrium modulus $E_0$ was determined as the minimum value of E' in the rubbery region of the curve. The ratio of the equilibrium modulus after

US 7,171,103 B2

**13**

aging to the equilibrium modulus prior to aging is reported as the modulus retention ratio after hydrolytic aging.

(vii) Microbending

A glass optical fiber (single mode fiber having a field diameter of 10.5 micron±1 micron at 1550 nm and 9.3 micron±0.4 micron at 1310 nm) was coated using a primary composition according to Table 1 and a commercial secondary composition. The microbending resistance of the fiber was determined by determining the attenuation of the coated optical fiber before and after winding the fiber around a drum (diameter 600 mm) covered with sandpaper (40 μm Alox grade by 3M™). The winding force was kept constant at 4N. The attenuation increase (difference between attenuation before and after winding) was determined at various wavelengths (as indicated in Table 1).

What is claimed is:

**1**. An inner primary coating composition having:

(a) an in-situ modulus (after cure) of less than 0.6 MPa;

(b) a cure dose to attain 95% of the maximum attainable modulus of less than 0.65 J/cm$^2$; and

(c) a modulus retention ratio (after cure) of at least 0.6 after hydrolytic aging; wherein said composition comprises:

    (i) 20–98 wt. % relative to the total weight of the composition of a radiation curable urethane (meth) acrylate oligomer having polyether polyol backbone;

    (ii) 0–80% wt. % relative to the total weight of the composition of one or more reactive diluents;

    (iii) 0.1–20 wt. % relative to the total weight of the composition of one or more photoinitiators; and

    (iv) 0–5 wt. % relative to the total weight of the composition of additives.

**2**. The composition according to claim **1**, wherein the number average molecular weight of said urethane (meth) acrylate is from about 1,200 g/mol to about 20,000 g/mol.

**3**. The composition according to claim **1**, wherein the number average molecular weight of said urethane (meth) acrylate is from about 2,200 g/mol to about 10,000 g/mol.

**4**. The composition according to claim **1**, wherein the number average molecular weight of said polyether polyol is from about 500 g/mol to about 15,000 g/mol.

**5**. The composition according to claim **1**, wherein the number average molecular weight of said polyether polyol is from about 1,500 g/mol to about 6,000 g/mol.

**6**. The composition according to claim **5**, wherein said polyether polyol is polypropylene glycol.

**14**

**7**. The composition according to claim **1**, wherein said one or more reactive diluents are selected from the group consisting of alkoxylated alkyl substituted phenol acrylates, alkoxylated aliphatic polyacrylates, and alkoxylated bisphenol A diacrylates.

**8**. The composition according to claim **1**, wherein said one or more reactive diluents comprise one or more aromatic rings.

**9**. The composition according to claim **1**, wherein said one or more photoinitiators contain a phosphorous, sulfur or nitrogen atom.

**10**. The composition according to claim **1**, wherein said one of said additives is a silane coupling agent.

**11**. The composition according to claim **1**, wherein said composition, when cured, has a glass transition temperature of below −35° C.

**12**. The composition according to claim **1**, wherein said composition, when cured, has a glass transition temperature of below −45° C.

**13**. The composition according to claim **1**, wherein said composition has an in-situ modulus (after cure) of less than 0.56 MPa.

**14**. The composition according to claim **1**, wherein said composition has an in-situ modulus (after cure) of less than 0.54 MPa.

**15**. The composition according to claim **1**, wherein said composition has an in-situ modulus (after cure) of less than 0.52 MPa.

**16**. A coated optical fiber comprising:

(a) an optical fiber;

(b) a primary coating obtained by curing the coating composition according to claim **1**;

(c) a secondary coating, wherein said secondary coating has:

    (i) a Tg of about 60° C. or higher;

    (ii) an elongation at break of at least 20%; and

    (iii) a tensile modulus of at least 500 MPa.

**17**. The coated optical fiber according to claim **16**, wherein said primary coating has an elongation at break of at least 75%.

**18**. The coated optical fiber according to claim **16**, wherein said primary coating has an elongation at break of at least 120%.

\* \* \* \* \*

## CERTIFICATE OF SERVICE

Pursuant to Federal Rules of Appellate Procedure ("FRAP") 25(a)(2)(D) and 25(c) and the May 17, 2012 Administrative Order Regarding Electronic Case Filing ("Order"), I hereby certify that on this 3rd day of February, 2015, I caused true and correct copies of the foregoing **BRIEF OF APPELLANT CORNING INCORPORATED** to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

Pursuant to ECF-10 of the Order, six (6) paper copies of the foregoing **BRIEF OF APPELLANT CORNING INCORPORATED** will be filed with the clerk within five (5) days of the Court's acceptance of the **BRIEF OF APPELLANT CORNING INCORPORATED** in ECF.

Pursuant to FRAP 25(c) and ECF-6, true and correct copies of the foregoing **BRIEF OF APPELLANT CORNING INCORPORATED** were electronically served on counsel listed below on this 3rd day of February, 2015.

Sharon A. Israel
Mayer Brown LLP
700 Louisiana Street, Suite 3400
Houston, TX 77002
Telephone:  (713) 238-2630
Facsimile:  (713) 238-4630
E-mail: sisrael@mayerbrown.com

*Attorneys for Appellee,*
*DSM IP Assets B.V.*

Erick J. Palmer
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 701-8352
Facsimile:  (312) 701-7711
E-mail: ejpalmer@mayerbrown.com

*Attorneys for Appellee,*
*DSM IP Assets B.V.*

Kyle E. Friesen                     Joseph A. Mahoney
Mayer Brown LLP                     Mayer Brown LLP
700 Louisiana Street, Suite 3400    71 South Wacker Drive
Houston, TX 77002                   Chicago, IL 60606
Telephone:  (713) 238-2691          Telephone:  (312) 701-8979
Facsimile:  (713) 238-4691          Facsimile:  (312) 701-7711
E-mail: kfriesen@mayerbrown.com     E-mail: jmahoney@mayerbrown.com

*Attorneys for Appellee,*           *Attorneys for Appellee,*
*DSM IP Assets B.V.*                *DSM IP Assets B.V.*


                              */s/Michael L. Goldman*
                                    Michael L. Goldman

LeClairRyan, A Professional Corporation
70 Linden Oaks, Suite 210
Rochester, New York  14625
Telephone:  (585) 270-2101
Facsimile:  (585) 270-2179
E-mail:  michael.goldman@leclairryan.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify on this the 3rd day of February, 2015, that the foregoing **BRIEF OF APPELLANT CORNING INCORPORATED** complies with the relevant type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  This brief is typed in Times New Roman (14 point) and contains 13,963 words according to the Microsoft Word 2010 system used to prepare it excluding those items exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

Dated:  February 3, 2015　　　　　By:  _/s/Michael L. Goldman_____
　　　　　　　　　　　　　　　　Michael L. Goldman

　　　　　　　　　　　　　　　　*Attorney for Appellant*
　　　　　　　　　　　　　　　　*Corning Incorporated*